25 F.3d 804
 Michael G. FORRESTER; Michaelene Ann Jenkins; Donna E.
Niehouse; Dena A. Niehouse; Nancy H. Scofield;
Harold E. Scofield, Plaintiffs-Appellants,
v.
CITY OF SAN DIEGO, a municipal corporation; Donald Fashing;
D. Hannan, Defendants-Appellees.
 No. 92-55137.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 14, 1993.
Decided June 1, 1994.
 
 Lloyd Edward Tooks, San Diego, CA, for plaintiffs-appellants.
 Francis M. Devaney, Deputy City Atty., San Diego, CA, for defendants-appellees.
 Appeal from the United States District Court for the Southern District of California.
 Opinion by Judge HALL; Dissent by Judge KLEINFELD.
 Before: GIBSON,* HALL, and KLEINFELD, Circuit Judges.
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 Anti-abortion demonstrators who were arrested for trespass and unlawful assembly appeal (1) the district court judgment that the City of San Diego's policy regarding pain compliance arrest techniques was constitutional and (2) the jury verdict that San Diego's police officers did not use excessive force in executing their arrests. Because sufficient evidence supported the jury verdict, we affirm without deciding whether the city's policy authorized unreasonable uses of force.
 
 I.
 
 2
 In March 1989, San Diego police became aware that Operation Rescue planned to stage several anti-abortion demonstrations in the city.[1] Cognizant of the protest tactics used by Operation Rescue members in other demonstrations, San Diego Police Chief Burgreen met with his staff to formulate a plan of action. After considering several options, Burgreen adopted a policy for dispersing and arresting demonstrators who trespassed on and blocked entrances to private medical clinics.
 
 
 3
 The policy provided for the police first to give the protesters an opportunity to avoid arrest by leaving the premises after a verbal warning. The police were then to arrest those who refused to leave and give them another opportunity to move voluntarily. Finally, the police were to remove the remaining demonstrators with "pain compliance techniques" involving the application of pain as necessary to coerce movement. The "pain compliance" policy provided for the police to use either "Orcutt Police Nonchakus" (OPNs) (two sticks of wood connected at one end by a cord, used to grip a demonstrator's wrist) or direct physical contact (firm grip, wrist-and arm-twisting, and pressure point holds).
 
 
 4
 Although San Diego police officers generally have discretion either to use pain compliance or to drag and carry arrestees, Burgreen's policy absolutely prohibited officers from using the drag and carry method. Burgreen changed the existing rule in anticipation of the Operation Rescue protests for two reasons. First, he wanted to prevent the back injuries that multiple dragging and carrying causes to police and arrestees. And, second, he wanted to maximize police control over the large crowds he anticipated.
 
 
 5
 In each of the three demonstrations at issue, protesters converged upon a medical building, blocking entrances, filling stairwells and corridors, and preventing employees and patients from entering. When police or property owners attempted to remove them, the demonstrators "passively" resisted by remaining seated, refusing to move, and refusing to bear weight. At the first demonstration, the initial police officers on the scene dragged and carried arrestees. However, after the arrival of the "pain compliance unit," and in each subsequent demonstration, the officers implemented Burgreen's policy and used only pain compliance techniques.
 
 
 6
 For each arrest, the officers warned the demonstrators that they would be subject to pain compliance measures if they did not move, that such measures would hurt, and that they could reduce the pain by standing up, eliminating the tension on their wrists and arms. The officers then forcibly moved the arrestees by tightening OPNs around their wrists until they stood up and walked. All arrestees complained of varying degrees of injury to their hands and arms, including bruises, a pinched nerve, and one broken wrist.
 
 
 7
 Several subsequently filed suit, claiming that the police violated the Fourth Amendment by using excessive force in executing the arrests and that San Diego's pain compliance policy was unconstitutional. A magistrate judge found the policy to be constitutional and granted summary judgment in favor of the city. The judge, however, allowed the case to proceed to the jury in order to determine whether any particular uses of force were unconstitutional. After viewing a videotape of the arrests, the jury concluded that none involved excessive force and returned a verdict for the city. After denying a JNOV motion, the court entered judgment on the verdict for the city and the demonstrators filed a timely appeal.
 
 II.
 
 8
 The demonstrators first contend that evidence does not support the jury's verdict. Keeping in mind that "[w]hether the amount of force used was reasonable is usually a question of fact to be determined by the jury," Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 2995, 120 L.Ed.2d 872 (1992), we review the jury's verdict to determine "whether it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Eberle v. City of Anaheim, 901 F.2d 814, 818 (9th Cir.1990) (internal quotation omitted).
 
 A.
 
 9
 "[A]ll claims that law enforcement officers have used excessive force ... in the course of an arrest ... should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). E.g., Ward v. City of San Jose, 967 F.2d 280, 284 (9th Cir.1991).
 
 
 10
 Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.... [T]he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them.
 
 
 11
 Graham, 490 U.S. at 396-97, 109 S.Ct. at 1872 (internal quotations omitted). E.g., Barlow, 943 F.2d at 1135. "The question is not simply whether the force was necessary to accomplish a legitimate police objective; it is whether the force used was reasonable in light of all the relevant circumstances." Hammer v. Gross, 932 F.2d 842, 846 (9th Cir.) (en banc), cert. denied, --- U.S. ----, 112 S.Ct. 582, 116 L.Ed.2d 607 (1991).[2]B.
 
 
 12
 We think ample evidence supports the jury's conclusion that the officers acted reasonably in using pain compliance techniques to arrest the demonstrators. In addition to hearing the testimony of numerous officers and demonstrators, the jury watched the entire videotape of the arrests (and watched excerpts on repeated occasions). As the district court noted, the videotape created an extensive evidentiary record: "Thanks to videotaped records of the actual events, plus the testimony of witnesses on both sides, the jury had more than a sufficient amount of evidence presented to them from which they could formulate their verdicts.... The extensive use of video scenes of exactly what took place removed much argument and interpretation of the facts themselves."[3]
 
 
 13
 The evidence satisfies the Graham inquiry of reasonableness. First, the nature and quality of the intrusion upon the arrestees' personal security was less significant than most claims of force. The police did not threaten or use deadly force and did not deliver physical blows or cuts. Rather, the force consisted only of physical pressure administered on the demonstrators' limbs in increasing degrees, resulting in pain. Compare Eberle, 901 F.2d at 820 (reasonable as a matter of law to use a painful "finger control hold" to remove belligerent spectator from arena) with Hammer, 932 F.2d at 846 (unreasonable to forcibly extract blood against the will of arrestee who indicates a willingness to undergo alternative form of alcohol testing).
 
 
 14
 Second, the city clearly had a legitimate interest in quickly dispersing and removing lawbreakers with the least risk of injury to police and others. The arrestees were part of a group of more than 100 protesters operating in an organized and concerted effort to invade private property, obstruct business, and hinder law enforcement. Although many of these crimes were misdemeanors, the city's interest in preventing their widespread occurrence was significant: "[T]he wholesale commission of common state-law crimes creates dangers that are far from ordinary. Even in the context of political protest, persistent, organized, premeditated lawlessness menaces in a unique way the capacity of a State to maintain order and preserve the rights of its citizens." Bray, --- U.S. at ----, 113 S.Ct. at 769 (Kennedy, J., concurring). The city had a substantial interest in preventing the organized lawlessness conducted by the plaintiffs in this case, and the police were also justifiably concerned about the risk of injury to the medical staff, patients of the clinic, and other protesters. Id. at ----, 113 S.Ct. at 780 (O'Connor, J., dissenting).
 
 
 15
 Despite these governmental interests, the demonstrators argue that dragging and carrying was a more reasonable means of accomplishing the city's goals and therefore contend that any other method was excessive. Police officers, however, are not required to use the least intrusive degree of force possible. Rather, as stated above, the inquiry is whether the force that was used to effect a particular seizure was reasonable, viewing the facts from the perspective of a reasonable officer on the scene. See Graham, 490 U.S. at 396, 109 S.Ct. at 1871. Whether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue. See Hammer, 932 F.2d at 846.[4]
 
 
 16
 Each officer had the discretion to use force or not, and if deciding to do so, how much force to apply. The videotape indicates that, after the demonstrators ignored pleas to desist and warnings regarding pain compliance techniques, the officers used minimal and controlled force in a manner designed to limit injuries to all involved. Substantial evidence supported the jury verdict.[5]
 
 III.
 
 17
 The demonstrators contend that, even if the police did not violate the Fourth Amendment by using pain compliance techniques to execute their arrests, the city's pain compliance policy is itself unconstitutional. We need not decide this issue.
 
 
 18
 By finding that the arrests did not involve the use of unreasonable force, the jury found that neither the officers nor, implicitly, the policy, caused any deprivation of constitutional rights. This renders moot the question of whether the city's policy authorized the use of constitutionally excessive force:
 
 
 19
 [None] of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers if in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.
 
 
 20
 City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986). E.g., Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir.1993); Robinson v. City of St. Charles, 972 F.2d 974, 977 (8th Cir.1992).
 
 
 21
 Accordingly, we now have no reason to decide whether the city's pain compliance policy authorized the use of excessive force.
 
 IV.
 
 22
 Both parties request that we exercise our discretion to award attorney's fees. See 42 U.S.C. Sec. 1988 (1988). We decline to do so. Because the demonstrators have not procured relief modifying the city's behavior, they are not prevailing parties. Farrar v. Hobby, --- U.S. ----, ----, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992). The demonstrators' action, however, is not so meritless as to justify an award of fees to the city. Elks Nat'l Found. v. Weber, 942 F.2d 1480, 1485 (9th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 2995, 120 L.Ed.2d 872 (1992).
 
 V.
 
 23
 Substantial evidence supports the jury verdict that San Diego's police officers did not use excessive force by applying pain compliance techniques to arrest the demonstrators. As a result, we affirm the district court without deciding the constitutionally of the city's pain compliance policy.
 
 
 24
 AFFIRMED.
 
 KLEINFELD, Circuit Judge, dissenting:
 
 25
 I respectfully dissent.
 
 
 26
 The parties agreed to this stipulation of facts about Donna Niehouse's arrest:
 
 
 27
 Plaintiff Donna Niehouse's arrest and seizure on April 8 included the following conduct:
 
 
 28
 Mrs. Niehouse was sitting on the ground on the premises with her legs crossed;
 
 
 29
 Defendant Fashing approached Mrs. Niehouse and advised her that she would be arrested for trespassing if she did not leave the premises;
 
 
 30
 Mrs. Niehouse did not respond to Fashing;
 
 
 31
 Defendant Fashing advised Mrs. Niehouse that she was under arrest, and immediately two other San Diego police officers placed OPN's around each of Mrs. Niehouse's wrists;
 
 
 32
 Defendant Fashing said to Mrs. Niehouse, "Stand up and walk and there will be no pain at all";
 
 
 33
 When Mrs. Niehouse did not move defendant Fashing ordered the police officers holding the OPN's around her wrists to "put some pain on her";
 
 
 34
 As the police officers began to twist the OPN's around Mrs. Niehouse's wrists, she moved from a sitting position to a position on her knees and began screaming;
 
 
 35
 The police officers continued to twist the OPN's around Mrs. Niehouse's wrists, and she continued to scream on her knees, and Sergeant Fashing continued to say "stand up and walk";
 
 
 36
 Defendant Fashing then said, "Arrest team come on in," and, while the two police officers continued to twist the OPN's around Mrs. Niehouse's wrists, another police officer grabbed her by her hair and back of her pants, and pulled her to her feet;
 
 
 37
 Mrs. Niehouse then walked from the premises in the company of the two police officers who continued to hold the OPN's around her wrists.
 
 
 38
 The use of nonchakus to hurt these non-violent, passive demonstrators was unconstitutional as a matter of law, because it was both ineffective and unnecessarily brutal.
 
 
 39
 Before explaining my reasons for dissenting, I shall point out some important things we have not decided. First, we have not decided that pain compliance techniques are constitutionally permissible as a matter of law. We have done no more than let a jury verdict stand because there was evidence on which the majority believes rational jurors could have based a verdict. The identical facts could easily have resulted in substantial damages awards which would have been upheld on the same principles which led to the affirmance in this case. Municipal officials would be mistaken to think that this decision approves the use of pain compliance on Operation Rescue demonstrators. Second, we have not decided whether plaintiffs' First Amendment rights were violated. Police Chief Burgreen testified that only the pro-life demonstrators of Operation Rescue, not other demonstrators, have been subjected to a policy of arrest by deliberate infliction of severe pain. This raises a First Amendment question. We have not answered it, because plaintiffs based their claim on the Fourth Amendment, not the First.
 
 
 40
 I dissent because the majority improperly evaluates the use of force in this case. The reasonableness of force is evaluated according to objective criteria, none of which were satisfied:"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
 
 
 41
 The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.
 
 
 42
 Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989) (emphasis added) (citations omitted); White v. Pierce County, 797 F.2d 812, 816 (9th Cir.1986) ("The reasonableness of force is analyzed in light of such factors as the requirements for the officer's safety, the motivation for the arrest, and the extent of the injury inflicted."). See also Benjamin I. Whipple, Comment, The Fourth Amendment and the Police Use of "Pain Compliance" Techniques on Nonviolent Arrestees, 28 San Diego L.Rev. 177 (1991). The Graham factors cannot be mechanically applied, but neither can they be ignored.
 
 
 43
 The demonstrators were sitting on the concrete praying and singing hymns. They resisted arrest passively, not actively, by going limp. The force used to hurt the demonstrators was not reasonable for the severity of the crimes being committed, threat to safety, or risk of flight. The police did not expect the pain to work effectively to get the demonstrators into the vans, and in fact it did not work better than more conventional arrest techniques. The demonstrators were breaking the law, so they were properly subject to arrest, conviction and punishment, but they were also people, entitled to constitutional protection against unreasonable force. As I apply the Graham factors one by one, I cannot see how the force used in this case could be reasonable.
 
 
 44
 A. Split-Second Judgment.
 
 
 45
 The force used here cannot be granted the latitude Graham requires for split-second police judgments at the scene. The decision to use the force at issue was not made at the scene. Chief Burgreen made his policy in advance of the demonstrations, after extensive consultation and deliberation. The policy denied arresting officers the discretion to make on-the-scene "judgments ... about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397, 109 S.Ct. at 1872. Nevertheless, the force must be "judged from the perspective of a reasonable officer on the scene." Graham, 490 U.S. at 396, 109 S.Ct. at 1872. While it would be unfair to judge a split-second decision as stringently as one made with time for deliberation, the converse is not true. Police are not allowed to use force which, "judged from the perspective of a reasonable officer on the scene," id., is unreasonable, because of a policy adopted without the benefit of on-the-scene knowledge. A hypothetical case makes this obvious. Suppose a police chief reasonably, in light of what was then known to him, instructed his officers with regard to a hostage taker, "if you get a clear shot, shoot to kill--he is armed and extremely dangerous." An officer saw the suspect, and before shooting, ascertained with certainty that the suspect was no longer armed and no longer dangerous. He could not reasonably shoot the suspect dead, despite the policy decision made in advance. Cf. Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).
 
 
 46
 Garner is instructive. There, the Court overturned the result of a trial in which the defendants prevailed. The Court held that the use of deadly force to prevent the escape of an apparently unarmed felon was unreasonable. While this case does not present the unreasonable use of deadly force, it does present the use of unreasonably disproportionate force. The use of intensely painful yet ineffective force against demonstrators engaged in completely passive resistance is always unconstitutional.
 
 
 47
 B. Severity of the crime.
 
 
 48
 Chief Burgreen testified that the crimes were all misdemeanor trespassing and "a marginal resisting arrest," marginal because the city attorney was reluctant to prosecute resisting arrest cases where the arrestees did not attempt to strike the officer. The parties stipulated, and the jury was instructed, that "each plaintiff was arrested for trespass and/or failure to disperse from an unlawful assembly." The majority opinion says "many of these crimes were misdemeanors," implying that some were felonies. The implication is not supported by the record. The parties stipulated to just what the crimes were. The majority suggests a higher degree of "severity of the crime" by quotations from a concurrence and a dissent in two other cases concerning other Operation Rescue demonstrations at other times and places. That is a mistaken use of appellate judges' pronouncements. We are obligated to use the record in this case as the basis for our decision. These plaintiffs are entitled a decision based on what they and the police did here. Chief Burgreen testified, without contradiction, that all the crimes committed were misdemeanors. The stipulated facts in this case put the crimes toward the low end of severity, so less force was reasonable than for more serious crimes. A hundred trespassers pose a more serious concern than one, and may be subject to more force within the bounds of reasonableness, but they are still only trespassers.
 
 
 49
 C. Resistance to Arrest.
 
 
 50
 The third Graham criterion has two parts, whether the persons arrested were "actively resisting arrest or attempting to evade arrest by flight." The demonstrators did not "actively" resist arrest. They passively resisted arrest. The stipulation of facts which the jury was instructed to apply recited that none of the plaintiffs threatened, struck, or attacked the officers. They sat. They did resist arrest, by sitting instead of walking to the van, sometimes by crossing their legs, and in one case, a woman had tied her legs together with string. But the Supreme Court's use of the adverb "actively" could only be for the purpose of distinguishing active from passive resistance. Obviously the demonstrators did not attempt to "evade arrest by flight."
 
 
 51
 D. Immediate threat.
 
 
 52
 The second Graham criterion, "immediately of a threat to the safety of officers or others," affords justification for the use of force, but not the force which was used. The stipulation of facts read to the jury as part of the instructions said that the police expected, when the pain compliance policy was adopted, that the demonstrators "would likely be people who were neither dangerous nor people who would attempt to actively resist being forcibly removed from the premises." The stipulation also said that none of the plaintiffs threatened, struck or physically attacked any of the officers. The uncontradicted evidence, corroborated by videotapes of the demonstrations, established that the demonstrators just sat praying and singing hymns. Chief Burgreen described the Operation Rescue demonstrators in this case as "people who profess to be law abiding people and are law abiding people in every other sense of the word." There was not a scintilla of evidence that any demonstrator engaged in or threatened to engage in any violence of any kind against anyone.
 
 
 53
 Most of the evidence for "immediacy of a threat to the safety of officers or others" had to do with potential back injuries to police officers from picking people up or dragging them. Chief Burgreen testified that during the 1960's and 1970's, when the police operated ambulances, the leading cause of disability retirements among police officers was back injuries from picking people up and carrying them. The incidence of back injuries fell off dramatically when the police ambulance program ended in the late 1970's. He did not think his police officers, particularly his female and small male officers, were strong enough and big enough, even in groups of four or six, to carry or drag the demonstrators to the vans without hurting their backs:
 
 
 54
 A. We had a lot of discussions about it. We discussed the fact that--that--when I was hired, most police officers were male. Most were six feet tall, weighed 200 pounds, but for--for reasons over the years, including having some of your standards change over the years in terms of courts, we are hiring totally a different kind of officer.
 
 
 55
 We hire 20 percent of our entry level police officers are women. We have no height standard. We have no weight standard. You can be a five foot tall, 100 pound woman and you can get hired as a police officer. In fact, we hire people who are five feet tall and weigh 100 pounds that are women. We hire small men.
 
 
 56
 We don't have the luxury of having everybody six feet tall and 200 pounds and physically can handle themselves and carry their own weight.
 
 
 57
 . . . . .
 
 
 58
 Q. You do have big, strong men on the force, don't you?
 
 
 59
 A. Yes, we do.
 
 
 60
 Q. Why don't you just assign those to the demonstrators?
 
 
 61
 A. We actually had a little talk about that and it came down to we felt that that would be perceived as, No. 1, a goon squad, No. 2, I made it clear to the people who were planning that I wanted officers who were caring; officers who would not use too much force, if we had to use force; officers with verbal skills who would do everything they could do to talk people into coming along peacefully with us so that we wouldn't have to use any pain at all.
 
 
 62
 He testified that he had learned from someone, possibly another department, that wheelchairs were sometimes used to carry off peaceful demonstrators, but even with stretchers, gurneys or wheelchairs, he thought officers might hurt themselves. Nevertheless, he conceded that he had no experience at any time with officers lifting demonstrators or getting back injuries from lifting demonstrators.
 
 
 63
 This kind of threat to safety of officers, from their own physical limitations relative to the demands of the task, is not like an active threat by a violent person. As Chief Burgreen conceded, this particular reason to hurt people could be obviated by hiring or assigning larger officers to the task. Reasonableness does not embrace ordering all officers to hurt people because some would be too small to arrest the demonstrators without hurting them. In this particular case, large officers were in several cases arresting people of small and medium stature. One of the plaintiffs, Michaelene Jenkins, weighed only 125 pounds. Others weighed 160-180 pounds. A person who carries a 24-pack of soda and a 24-pack of beer from the grocery store to the car carries about 40 pounds. Four officers carrying Ms. Jenkins would bear under 32 pounds each. Dragging would require less weight to be lifted than carrying. The people at the airline check-in counter, of both sexes, who move the luggage from the scale to the conveyor belt lift considerable dead weight all day. The objective measure of reasonable force cannot be based on police officers not able to carry their groceries to the car or carry their bags to the check-in counter.
 
 
 64
 The second threat to safety was the need to accomplish quick arrests. Chief Burgreen testified:
 
 
 65
 So, anyway, what we also saw was people who were on the other side of this issue also showing up. And in several cases we had several hundreds of those people who were loud and outspoken in their beliefs in terms of, well, I guess you call it the pro-choice folks. They would have signs and they would--they would also try to get physically involved in helping people through the lines, which could lead to all sorts of problems.
 
 
 66
 What we had was several types--a couple hundred people on both sides who were a very, very, volatile issue. They were very emotional and you had everything that all lined up for a nice little riot.
 
 
 67
 This threat resembles the one among the football fans in Eberle v. City of Anaheim, 901 F.2d 814 (9th Cir.1990), although it lacks the beer-throwing, kicking and pushing which exacerbated the situation in that case. In the case at bar, Captain Lord testified that the police left their shields and batons behind, and did not wear helmets or face shields, because the Operation Rescue demonstrators were not violent.
 
 
 68
 E. Ineffectiveness.
 
 
 69
 The distinction between the force in this case and in Eberle is that in Eberle the force was effective but not painful. Here, it was painful yet ineffective. In Eberle, the police officer used an "index-finger control hold." The officer "testified that the finger-hold allowed him to direct Kiser's movement, but that he did not apply the hold with enough force to inflict pain." The arrestee, who was quickly and effectively removed from the volatile situation by means of the finger-hold, "said nothing during the trip to the security office to indicate that he was in any pain." Eberle, 901 F.2d at 816. In the case at bar, plaintiffs' expert witness, an experienced police officer, testified that he had been taught to use pain compliance which "causes no damage and that gets people to do what the officer wants," such as "pinching people on the fatty part of their arms which gets them to move in a hurry and which doesn't cause any lasting damage."
 
 
 70
 Sergeant Fashing, the nonchakus training officer, told the police that "most of the time they'll sit there and scream because it does in fact hurt but they won't move, so you'll have to follow up with some kind of control hold." The pain caused lasting damage, from tendon injuries to breaking a surgeon's wrist, yet did not work very well to get the demonstrators on their feet and into the van. Ms. Jenkins, the 125 pound demonstrator, testified that "I was trying to get up, but it hurt so much that I couldn't--at least for awhile I couldn't get up.... I was crying and I kept feeling like I was going to pass out and it was just really difficult to walk." Likewise, Donna Niehouse testified that the pain "was so bad I couldn't see, ... I almost lost consciousness and I fell on the other officer." Harold Scofield testified that although the pain was the most severe he had felt since he broke his leg at age 10, the officers searched for a pressure point behind his ear because the pain was not getting him up. Sergeant Fashing testified that he used his hands on pressure points around the jaw, chin, nose and behind the ear on the demonstrators, because the nonchakus were not making people get up and walk to the vans, even when used to the point of causing physical damage.
 
 
 71
 Nor were the nonchakus easy and efficient tools for the police to use. They required two officers, each of whom had to use both hands, to apply pressure to the demonstrators' wrists. Police officers testified they needed both hands to operate the nonchakus, and the nonchakus were hard to use on women because their wrists were sometimes too narrow to hold the rope in place. Each arrest, on the videotape, appeared to require two to four officers, and a fair amount of cooperation by the demonstrator to allow the nonchakus to be put around his or her wrists.
 
 
 72
 To be reasonable, force has to be designed to accomplish a legitimate objective efficiently. The objective was to make the demonstrators move from where they were seated to the vans. But the force was not used to move the demonstrators into the vans. It was used to punish them for refusing to get up and walk to the vans. It worked as punishment does, by hurting people enough so that they do something to avoid it. The nonchakus did not work like pinching the fatty part of the arm, or pulling a person by the finger, or a hammerlock, to move the demonstrators to the van. The nonchakus look like a device that would facilitate dragging, but that is not how they were used. The pressure was relaxed and they were left loose around the wrists of the demonstrators once they got up and walked. They were used as a pain inflicting device.
 
 
 73
 In this case, a more efficient pain compliance technique would have been for the officers to warn demonstrators that if they did not move voluntarily they would be burned with lighted cigarettes, and then hold the cigarettes against their skin until they complied. The pain would have been comparable, the risk of long term disability less than from tendon injury or fractures in the wrist, and the officers would have been able to keep one hand free. Probably one officer instead of two could have accomplished each arrest. I am quite sure we would not accept the use of lighted cigarettes against the skin as reasonable force in this case. Yet the nonchakus were worse. They inflicted more serious injuries, with longer lasting consequences, without working any better to arrest people rapidly with minimum police effort. The difference may be that nonchakus at least look like dragging devices rather than torture devices. But they were not being used to drag, so that distinction does not work.
 
 
 74
 Police must sometimes use force, and inflict pain, in the performance of their duties. They need not use the least painful alternative. Not all intentional infliction of pain is torture. Use of pain is not constitutionally prohibited, but it is limited by the Fourth Amendment's reasonableness component. Whether the force works bears on its reasonableness. Because the ultimate purpose of the police was to make the demonstrators get up and walk, and the nonchakus inflicted great pain and subsequent disability without directly accomplishing this purpose, their use could not be reasonable.
 
 
 75
 Chief Burgreen testified that he expected the demonstrators to suffer abrasions, strained ligaments and strained tendons, with a possibility of broken bones. They did suffer all those injuries. Yet the police still needed to use control holds, such as manipulation of nerve pressure points, hair pulling and picking women up by their pants, to get them to the van. Determining reasonableness of force "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham, 490 U.S. at 396, 109 S.Ct. at 1871. The nature and quality of the intrusion was infliction of severe pain in the course of an arrest. The countervailing governmental interests were speedy arrest and protection of the police from back injuries. Because the governmental interest does not appear to have been efficiently served by the technique, there is less to balance against the infliction of pain than if the technique had at least saved the police time and personnel.
 
 
 76
 F. The Police Problem of Passive Resistance.
 
 
 77
 Passive resistance to arrest creates serious difficulties for the police, because we are a civilized people who abhor brutality. Thoreau called civil disobedience "a counter friction to stop the machine." Henry D. Thoreau, On the Duty of Civil Disobedience, in Walden 229 (Signet Classics ed. 1960) (1845). This particular kind of political protest technique has a well developed philosophy. Mohandas Gandhi set out the theory of satyagraha in 1909, after using the practice in earlier South African demonstrations against racial discrimination:
 
 
 78
 Passive resistance is a method of securing rights by personal suffering; it is the reverse of resistance by arms.... If I do not obey the law, and accept the penalty for its breach, I use soul-force. It involves sacrifice of self.
 
 
 79
 Everybody admits that sacrifice of self is infinitely superior to sacrifice of others. Moreover, if this kind of force is used in a cause that is unjust, only the person using it suffers. He does not make others suffer for his mistakes.
 
 
 80
 Mohandas K. Gandhi, Indian Home Rule, in The Ideologies of Developing Nations 80-81 (Paul E. Sigmund, Jr. ed. 1963). Martin Luther King, Jr. built upon this philosophy to accomplish some of our finest triumphs as a nation.
 
 
 81
 The use of this philosophy presupposes a legal order. If there is no effective legal order, then there is no sacrifice of self, no martyrdom, no bearing witness. Instead, the refusal to obey the law is merely anarchy which thwarts democratic rule. The philosophy of passive resistance accepts the propriety of arrest and punishment. As Martin Luther King explained, "an individual who breaks a law that conscience tells him is unjust, and willingly accepts the penalty by staying in jail to arouse the conscience of the community over its injustice, is in reality expressing the very highest respect for law." Martin Luther King, Jr., Letter From a Birmingham Jail (1963). The demonstrators' adherence to nonviolence in this case is why the police knew they could leave behind their helmets, facemasks and batons, and that the only risk to them from the demonstrators was back strain from hauling their limp bodies away.
 
 
 82
 This passive resistance philosophy presupposes a civilized community which will not accept brutality toward the demonstrators. Had Gandhi's followers laid down on Stalin's or Hitler's train tracks, the trains would have rolled over their bodies, and the government would not have concerned itself with popular revulsion. If the rest of the country had watched the arrests at Pettus Bridge on the march to Selma and said "good-that's what those troublemakers deserve," then the Voting Rights Act of 1965 would not have passed.
 
 
 83
 Watching the videotape, and seeing small, middle aged women scream in agony as the nonchakus were twisted around their wrists made me physically ill. Yet the police still had to do such things as pulling them by the hair and back of their pants to move them to the vans. The crimes being committed looked about the same as those committed by Freedom Riders in the 1960's: trespass and failure to disperse. People will differ, as they did then, about the correctness of the demonstrators' goals, but as Gandhi explained, this philosophy of lawbreaking concedes the propriety of arrest and punishment for the illegality, and the possibility of wrong purposes. The Graham standard of reasonable force bars this use of pain as a law enforcement tool. The intentional infliction of pain was not a reasonable means of achieving a legitimate end.
 
 
 84
 While we value law and order, we value individual liberty and compassion so profoundly that we tolerate a good deal of disorder, and are lenient, compared to many regimes, about lesser violations of law. The intentional infliction of severe pain during an arrest of a passively resisting demonstrator, when it is not incidental to an efficient means of making the arrest, is inconsistent with those values. Passive resistance tests our level of civilization.
 
 
 
 *
 The Honorable Floyd R. Gibson, Senior Circuit Judge for the United States Court of Appeals, Eighth Circuit, sitting by designation
 
 
 [1]
 Members of Operation Rescue stage "rescue" demonstrations at abortion clinics nationwide. "The purpose of these 'rescue' demonstrations is to disrupt operations at the target clinic and ... ultimately to cause the clinic to cease operations." Bray v. Alexandria Women's Health Clinic, --- U.S. ----, ----, 113 S.Ct. 753, 780, 122 L.Ed.2d 34 (O'Connor, J., dissenting). To achieve this goal, the demonstrators "trespass on clinic property and physically block access to the clinic, preventing patients, as well as physicians and medical staff, from entering the clinic to render or receive medical or counseling services." Id
 
 
 [2]
 In Graham, the Supreme Court indicated that relevant factors in the Fourth Amendment reasonableness inquiry "includ[e] the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S.Ct. at 1872 (emphasis added). The Court did not, however, limit the inquiry to just these factors. Rather, the Court instructed that the jury should consider "whether the totality of the circumstances justifies a particular sort of seizure." Id. (quoting Tennessee v. Garner, 471 U.S. 1, 8-9, 105 S.Ct. 1694, 1700, 85 L.Ed.2d 1 (1985))
 The dissent ignores this fact, attempting instead to turn the Graham analysis into a rigid three-part inquiry. This we cannot do. As the differences between Graham and this case aptly illustrate, "the facts and circumstances" of every excessive force case will vary widely. Constraining a jury's analysis to the dissent's limited inquiry would nullify Graham's test of "objective reasonableness" and would, therefore, contravene both the letter and spirit of the Court's pronouncement in that case.
 
 
 [3]
 The demonstrators contend that the only relevant evidence of reasonableness is the conduct of officers initially responding to the first protest. They note that the jury must analyze the issue "from the perspective of a reasonable officer on the scene," Graham, 490 U.S. at 396, 109 S.Ct. at 1872, and argue that actions of the subsequently arriving officers who implemented the pain compliance policy are not relevant because those officers could not have used the drag and carry method even if they thought it best to do so
 We disagree. Although Burgreen was not "on the scene" when he decided to implement the pain compliance policy, he based his decision on the anticipated circumstances of the demonstrations, which corresponded to the actual circumstances the officers encountered. On the videotape, the jury was able to observe the presence of factors indicating that pain compliance techniques were in fact reasonable, including the demonstrators' conduct, the officers' conduct, the size of the crowd, the presence of other protesters, the manner in which force was applied, and the consequences of that force.
 If this evidence were not sufficient, police departments could never develop general policies for handling arrests. Neither Graham nor the Fourth Amendment compels us to reach such an illogical conclusion.
 
 
 [4]
 The dissent reasons that, because "the nonchakus inflicted great pain and subsequent disability without directly accomplishing th[e] purpose [of forcing demonstrators to walk], their use could not be reasonable." [Dissent at 5726]. This after-the-fact analysis violates the fundamental precept of Graham; namely, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396, 109 S.Ct. at 1872
 
 
 [5]
 Although not explicitly stated, the dissent's analysis requires the conclusion that no reasonable juror could have found the city's use of force in this case to be reasonable. See, e.g., Eberle, 901 F.2d at 818. In so concluding, the dissent compares the city's "brutal" use of force with a hypothetical torture-by-lighted-cigarette method. This comparison displays a fundamental misunderstanding of the pain compliance techniques at issue. Unlike the use of a lighted cigarette, which would create immediate and searing pain, the discomfort produced by the OPNs was gradual in nature. The videotape (which was seen by the jurors) illustrates that the police first applied a loose grip and then progressively tightened their hold until the demonstrators stood and ceased resistance. The moment the demonstrators complied, the police released the OPNs. The jury's verdict reflects the fact that the police, in fact, did all they could to minimize the pain inflicted
 Moreover, the dissent trivializes the risk of injury (to both officers and demonstrators) inherent in "drag and carry" removal techniques, dismissively comparing the officers' task to that of "carry[ing] their groceries to the car." [Dissent at 812]. Even if the analogy were apt, which it is not, it assumes that police departments could, at will, "hir[e] or assign[ ] larger officers to the task." [Id. at 812] Such an assumption is dubious, at best, considering the modern realities of budget cutbacks and shrinking police forces. And, even if it were possible to hire or assign officers as the dissent suggests, to do so might impede the goal of providing opportunities in law enforcement irrespective of gender. The jury's verdict reflects the fact that a major motivating factor in Chief Burgreen's adoption of the pain compliance policy was prevention of injury to existing officers.