MARTIN, District Judge,
dissenting:
I respectfully dissent from the judgment in this case. I write to express my view that the Fourth Amendment forbids an officer from discharging repeated bursts of electricity into an already handcuffed mis-demeanant — who is sitting still beside a rural road and unwilling to move — simply to goad him into standing up. I also conclude that at the time of the incident, Deputy Rackard was on fair notice that his conduct was unconstitutional. Not only did Deputy Rackard unnecessarily discharge his taser gun against Mr. Buckley three times, but each time he did so, he repeatedly prodded Mr. Buckley’s body with the stun gun’s live electrodes — inflicting additional pain and leaving Mr. Buckley with sixteen burn scars. Because our law clearly establishes such conduct as unconstitutional, I would affirm the district court’s denial of qualified immunity and allow this action to proceed.
I.
A video captured the events in question, and I suggest it be published together with this opinion. See Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1775 n. 5, 167 L.Ed.2d 686 (2007). Because the factual details are important to the required analysis, I will supplement those included in Chief Judge Edmondson’s opinion, stated in a light most favorable to Mr. Buckley.
After Deputy Rackard handcuffed Mr. Buckley, he voluntarily got out of his car and walked with Deputy Rackard to the back of the car, but he then collapsed into a sitting position on the grass beside the road. The road was, by Deputy Rackard’s description, “desolate”[1] and “out in the middle of no where.”[2] There was scant traffic.[3] Mr. Buckley sat motionless with one leg crossed, leaning forward and sobbing.
After observing Mr. Buckley collapse and after attempting to persuade him to stand, Deputy Rackard turned away from Mr. Buckley and walked to his police car to communicate his status over the police radio. For thirty-five seconds, Mr. Buckley sat unattended. When Deputy Rack-ard returned and first attempted to lift Mr. Buckley, Buckley remained limp. Deputy Rackard partially lifted Mr. Buckley and dragged him several feet away *800 from the road. Mr. Buckley remained limp and uncooperative as he was dropped to the ground. Deputy Rackard again unsuccessfully attempted to persuade Mr. Buckley to stand up, and the following conversation transpired:
Deputy Rackard: [I’m] going to tase you. Do you understand me?
Mr. Buckley: [Crying] Go ahead.
Deputy Rackard: Buckley, get up ok? Mr. Buckley: [Crying]
Deputy Rackard: [Places taser on Mr. Buckley’s back.] I’m fixing to tase you. Get off the ground, ok?
Mr. Buckley: [Crying] I don’t care anymore. Tase me. [Sound of taser.]
(Buckley Video at 8:01:25.)
As the taser was applied that first time, Mr. Buckley cried out and fell forward from his seated position, with his chest on the ground, his knees bent and his legs folded underneath him. Mr. Buckley squirmed on the ground in response to the taser, but Deputy Rackard followed Mr. Buckley’s movement, attempting to maintain the taser gun’s contact with Mr. Buckley’s back. When Deputy Rackard lost contact with Mr. Buckley’s body, he immediately replaced the taser on him. Mr. Buckley unfolded his legs and lurched forward onto the right side of his body. The clicking of the taser gun continued and Deputy Rackard removed the gun from Mr. Buckley’s back, pinned it briefly against his chest, and then returned it to his back. Deputy Rackard continued holding the taser gun against Mr. Buckley’s back until it completed its five-second discharge.[4]
Upon completion of the first discharge, Mr. Buckley laid flat with his chest and face on the ground and his hands still cuffed behind his back, crying. Three seconds passed, and Deputy Rackard ordered Mr. Buckley to stand up, threatening again to shoot him with the taser gun. Though Mr. Buckley had been responsive and defiant before, he did not respond to Deputy Rackard’s second warning.
Deputy Rackard again discharged the taser into Mr. Buckley’s back, just twenty seconds after he had completed his first five-second discharge. This second tase also lasted five seconds. In response to the taser, Mr. Buckley flipped over onto his back, causing the taser gun to lose contact with his body. Deputy Rackard quickly re-pinned it onto Mr. Buckley’s chest, and in response, Mr. Buckley jerked forward. As with the first tase, Deputy Rackard followed Mr. Buckley’s movements in attempt to continue the contact between the taser and Mr. Buckley’s body. Deputy Rackard replaced the nodes of the taser onto Mr. Buckley’s back, lost contact, then lodged the taser gun a final time into Mr. Buckley’s back, holding it steady until it completed its discharge.
After the second discharge, Deputy Rackard stood up silently, turned away from Mr. Buckley, and returned to his police vehicle, leaving Mr. Buckley unattended on the side of the road for the second time. He returned approximately thirty seconds later and again ordered Mr. Buckley to stand up. Mr. Buckley sat cross-legged, leaning forward and still crying. He offered no response to Deputy *801 Rackard. After again attempting to lift Mr. Buckley, Deputy Rackard pressed the taser gun against Buckley’s back, warned Buckley, and discharged it a third time.
The final discharge caused Mr. Buckley again to lurch forward onto his side. As Deputy Rackard had before, he followed the movement of Mr. Buckley’s body with the taser gun. He lost contact with Mr. Buckley’s body at least four times, and each time re-pinned the taser against Mr. Buckley onto different areas of Mr. Buckley’s chest and back.
After the final discharge, Deputy Rack-ard left Mr. Buckley for the third time and returned to his police car. He announced over the radio that the “subject’s in custody; not wanting — refusing to come to the car.” He approached Mr. Buckley briefly and again returned to his patrol car, leaving Mr. Buckley unattended for the fourth time during the encounter. Less than three minutes later — and five minutes from the time Deputy Rackard first tased Mr. Buckley — a second officer arrived on the scene. The two officers easily lifted Mr. Buckley off the ground and escorted him away. This action followed.
II.
The first question, as instructed by Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), is whether Deputy Rackard used excessive force. This is not a case about whether an officer may use a taser gun to subdue an unruly or dangerous individual. See Zivojinovich v. Barner, 525 F.3d 1059, 1073 (11th Cir. 2008) (“[I]n a difficult, tense and uncertain situation the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force.”) (citation and internal quotations omitted); Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir.2004) (same). Rather, the question in the case is whether a taser gun may be used repeatedly against a peaceful individual as a pain-compliance device — that is, as an electric prod — to force him to comply with an order to move. Accord Hickey v. Reeder, 12 F.3d 754, 757-58 (8th Cir.1993) (holding single use of stun gun against prisoner to compel compliance with order to sweep cell was excessive under the Eighth Amendment as a matter of law).
Like the district court below, I conclude that the repeated and sustained use of the taser gun for the sole purpose of coercing Mr. Buckley to move was unreasonable under the circumstances and thus violated the Fourth Amendment.
A.
The Fourth Amendment affords a police officer “the right to use some degree of physical coercion” in effecting an arrest, Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), but the use of force must be “reasonably proportionate to the need for force.” Zivojino-vich, 525 F.3d at 1073. “ ‘[Djetermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the countervailing governmental interests at stake.’ ” Vinyard v. Wilson, 311 F.3d 1340, 1347 (11th Cir.2002) (quoting Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir.2002)). In conducting the objective inquiry under the Fourth Amendment, the Supreme Court has instructed us to give “careful attention” to three factors: “the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Graham, 490 U.S. at 396, 109 S.Ct. 1865 (emphasis added).
*802 B.
I begin by observing that all three Graham factors weigh strongly in Mr. Buckley’s favor.
First, the crimes for which Mr. Buckley was arrested — failure to sign a traffic citation and resisting arrest without violence — were non-violent misdemeanors. As such, Mr. Buckley’s raimes were of “ ‘minor severity for which less force is generally appropriate.” Reese v. Herbert, 527 F.3d 1253, 1274 (11th Cir.2008) (quoting Vinyard, 311 F.3d at 1348-49).
Second, Mr. Buckley did not present an immediate threat to Deputy Rackard or others. The video demonstrates that once he was handcuffed, Mr. Buckley voluntarily got out of his car, walked part of the way to the patrol car, then collapsed on the ground in a seated position. He sat still and cross-legged, with his hands cuffed behind his back. Mr. Buckley’s only movements after he collapsed on the ground were in response to each discharge of the taser gun. After each discharge was complete, Mr. Buckley sat or laid still, crying, and unwilling or unable to stand.[5] The video demonstrates that as Mr. Buckley responded to the taser, he moved away from the highway, not closer to it. At no time were Deputy Rackard or Mr. Buckley closer to the highway than they had been when Deputy Rackard first stopped the car.
Finally, Mr. Buckley did not actively resist arrest or attempt to flee. Rather, the video shows an emotionally overwrought individual, through sobs, passively refusing, if not unable, to comply with Deputy Rackard’s directive to pull himself up from the ground.
Deputy Rackard’s own behavior during the encounter, as seen on the video, further evidences that Mr. Buckley posed no danger or risk of flight. In the six-minute period that transpired after Mr. Buckley was handcuffed and on the ground, Deputy Rackard turned away from him and returned to his patrol car on four separate occasions, leaving Mr. Buckley unattended for substantial periods of time.[6] During the encounter, Deputy Rackard also advised over the radio that Mr. Buckley was “in custody.” Based on these circumstances, neither Deputy Rackard nor any reasonable officer on the scene could have concluded that Mr. Buckley was actively resisting arrest or attempting to flee.[7]
C.
Although the Eleventh Circuit has not spoken in terms of “pain compliance,” at *803 the very least, the Fourth Amendment prohibits the infliction of gratuitous pain and injury as a means to coerce compliance. E.g., Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 118, 123-24 (2d Cir.2004) (concluding that protesters who employed “passive resistance” techniques including going limp stated Fourth Amendment violation against officers who used pain compliance techniques, including choke holds and wrist-bending, because jury could conclude that “the officers gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances”); Headwaters Forest Def. v. County of Humboldt, 276 F.3d 1125, 1128-30 (9th Cir.2002); Forrester v. City of San Diego, 25 F.3d 804 (9th Cir.1994);[8] cf Asociacion de Periodistas de Puerto Rico v. Mueller, 529 F.3d 52, 60 (1st Cir.2008) (concluding that “mere obstinance by a crowd, without any evidence of a potential public safety threat or other law enforcement consideration,” did not justify use of batons and pepper spray). A taser functions by sending an “electric pulse through the body of the victim causing immobilization, disorientation, loss of balance, and weakness.” Matta-Ballesteros v. Henman, 896 F.2d 255, 256 n. 2 (7th Cm.1990). When used successfully, a taser renders an individual incapacitated, disoriented, and unable to move. Hickey, 12 F.3d at 757 (noting that when used effectively, a stun gun “temporarily incapacitated a threatening person, [giving] the officers involved momentary advantage and a chance to neutralize the threat”). Thus, by its design, a taser is particularly unsuited as a pain-compliance device.
Perhaps for this reason the Washington County Sheriffs Office did not authorize Deputy Raekard to use it in such a manner.[8]
[9] Each five-second discharge in fact frustrated Deputy Rackard’s efforts in getting Mi*. Buckley to stand and walk to the police car.[10] Cf. Headwaters Forest, 276 *804 F.3d at 1130 (stating that it was “even less necessary to repeatedly use pepper spray against the protesters when they refused to release”).
D.
Balancing the individual interests at stake against the need for force, the repeated use of the taser gun against Mr. Buckley was a wholly disproportionate response to the need to remove Mr. Buckley from the roadside and transport him to the police station.
First, Deputy Rackard’s use of force caused gratuitous pain and injury. Deputy Rackard used the taser gun against Mr. Buckley three times and applied the full force of each five-second discharge. As Mr. Buckley moved in response to each shocking, Deputy Rackard followed his movements, repeatedly re-pinning the ta-ser gun onto different areas of Mr. Buckley’s body, maximizing pain and injury. The taser gun caused immediate pain and was not applied gradually. Mr. Buckley described the pain as “tremendous” and “intense.”[11] Deputy Rackard’s repeated prods caused Mr. Buckley sixteen burn scars, which evidence the level of pain he experienced. Although it is difficult to see how even a single, brief electric discharge could have been reasonable under these circumstances, see Hickey, 12 F.3d at 757-58, there can be little doubt that the continuous and repeated manner in which Deputy Rackard discharged the taser gun was grossly disproportionate to the' need to move Mr. Buckley from the side of the road.
Second, as discussed above, Deputy Rackard’s use of the taser gun did little to further the state interest in completing the arrest. Given the disabling effects of a tase, it is not surprising that Mr. Buckley did not respond to Deputy Rackard’s orders and warnings any time after Deputy Rackard first discharged the taser gun.[12] Viewing the evidence in a light most favorable to Mr. Buckley, each five-second discharge frustrated Mr. Buckley’s ability to comply with Deputy Rackard’s order to stand and further reduced the need for force. It was thus unreasonable for Deputy Rackard to discharge the taser gun against Mr. Buckley a second time within only twenty seconds of the first discharge, when Mr. Buckley had not had sufficient time to regain his composure. And the lack of effectiveness of the first two discharges rendered the final discharge — inflicted after Deputy Rackard had called for backup — wholly unnecessary and cruel. Because Deputy Rackard’s repeated use of the taser was “not a good faith effort to restore discipline,” see Orem, v. Rephann, 523 F.3d 442, 447 (4th Cir.2008), and resembled more an “exaggerated response to [Mr. Buckley’s] misconduct and a summary corporal punishment,” Hickey, 12 F.3d at 759, it was not reasonable under the Fourth Amendment.
Finally, reasonable alternatives existed to move Mr. Buckley. Besides any number of less injurious, more effective and safer forms of pain-compliance techniques, Deputy Rackard had the option of calling for assistance. Indeed, pursuant to the policy of his police department, Deputy Rackard was required to do so upon dis *805 charging the taser gun.[13] Deputy Rackard has introduced no evidence that summoning the assistance of a backup police officer was burdensome at the time of the incident. The video demonstrates that backup arrived within five minutes of his request. Accord Headwaters Forest, 276 F.3d at 1128-30 (noting that officers could have moved protesters and removed lock-down devices “in a matter of minutes without causing pain or injury”). Under these circumstances, it was unreasonable for Deputy Rackard to repeatedly shock Mr. Buckley with the taser gun.
E.
Chief Judge Edmondson emphasizes the state interest in roadside safety and efficiency in single-officer arrests in concluding that Deputy Raekard’s use of force was constitutionally reasonable. However, the individual interests protected by the Fourth Amendment do not so easily give way. Many police encounters occur on the roadside at night, and each carries risks that could theoretically be reduced if police officers were authorized to inflict pain as a way to expedite them law-enforcement efforts. In this case, those risks were at a minimum, however, because traffic was scarce and Mr. Buckley and Deputy Rack-ard remained a good distance from the road.
Neither did Deputy Rackard’s repeated use of a taser gun against Mr. Buckley conserve resources. Mr. Buckley was easily moved from the side of the road to the patrol car by two officers. The Washington County Sheriff enacted a policy generally requiring the presence of a second office once a taser had been discharged. Thus Deputy Rackard did nothing to avoid the necessity for the involvement of other officers by applying the taser gun to Mr. Buckley, because backup was thereby required and, in any event, was already en route.
F.
In sum, I conclude that no reasonable officer could have believed that the force used by Deputy Rackard was necessary in response to the situation at hand. Lee, 284 F.3d at 1197. Accordingly, under the first prong of Saucier, 1 would hold that Mr. Buckley has brought forth sufficient evidence to state a Fourth Amendment violation against Deputy Rackard.
III.
I would also find, under the second prong of Saucier, that the law was clearly established at the time of the incident that Deputy Rackard’s conduct was unconstitutional. Whatever the debatability of employing a single, controlled electric shock against a non-compliant individual to coerce him into movement, in this ease Deputy Rackard repeatedly prodded Mr. Buckley’s body which maximized the level of pain he experienced. In light of the repeated and continuous nature of the force used against Mr. Buckley, the substantial pain and bodily injury that result *806 ed, and the absence of any arguable justification, I have no difficulty in concluding that no particularized preexisting case law was necessary for it to be clearly established that Deputy Rackard’s conduct was unconstitutional. Deputy Rackard’s use of force was so grossly disproportionate to the need for force that no reasonable officer would have believed such conduct was legal. See Lee, 284 F.3d at 1198-99 (holding that qualified immunity should be denied where an officer’s conduct “lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law”) (citation and internal quotations omitted); Hope v. Pelzer, 536 U.S. 730, 745, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002) (denying qualified immunity for “obvious cruelty” despite lack of factually similar prior precedent); Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir.2000) (“ ‘It would create perverse incentives indeed if a qualified immunity defense could succeed against those types of claims that have not previously arisen because the behavior alleged is so egregious that no like case is on the books.’ ”) (quoting McDonald v. Haskins, 966 F.2d 292, 295 (7th Cir.1992)).
Accordingly, I would affirm the district court’s denial of qualified immunity.

. (Appellant’s Br. at 6, 25.)

. (Appellant’s Br. at 20.)

. I respectfully disagree with Chief Judge Edmondson's description of the scene of the incident as a "busy road” with "considerable passing traffic.” (Op. of Edmondson, C.J., at 8, 11.) In the two minutes that transpired between the time Mr. Buckley collapsed on the ground and the time Officer Rackard discharged the taser the first two times, only two cars drove by. Only three more cars passed by the time Deputy Rackard tased Mr. Buckley the final time, two minutes later.

. Deputy Rackard testified during an internal investigation that the multiple burns on Mr. Buckley's body were caused by his repeated efforts to replace the taser gun on Mr. Buckley's body during each electric discharge: ‘‘[A]s I, uh, administered the taser ... the subject began to roll in an attempt to get away from it.... The taser made multiple contacts] with him on his upper body region because of the rolling action in his attempt to get away.” (Ex. H to Pl.'s Resp. to Defs.' Mot. for Summ. J. at 4 (Statement of Deputy Rackard, Nov. 3, 2006).)

. Although Chief Judge Edmondson suggests Üiat Mr. Buckley "could both run and kick” because his legs were not restrained and "was moving around on the ground alongside a busy road” (Op. of Edmondson, C.J., at 11), the video illustrates that Mr. Buckley was in no condition to run, never kicked, and moved only when his body was tased.

. Deputy Rackard strains to make the argument that Mr. Buckley "actively” resisted arrest, but he states that "the form the active resistence took was essentially gravitational,” and Mr. Buckley’s conduct amounted to a "roadside sit down strike.” (Appellant's Br. at 23-24.) There would have been little reason for the Supreme Court to use the adverb "actively" if its conception of “active resis-lance” included resistance by inaction — that is, by a fully limp arrestee who refuses an order to stand. See Graham, 490 U.S. at 396, 109 S.Ct. 1865.

. In his testimony, Deputy Rackard appears to recognize that Mr. Buckley did not present a danger or a risk of flight. He testified during an internal investigation that he chose to switch the taser gun to slun-gun mode, as opposed to electric-dart mode, because the “threat of physical violence to myself was minimized, uh, and I felt that at the time a touch tase would be more appropriate given the subject was handcuffed and on the ground.” (Ex. H to Pl.'s Resp. to Defs.’ Mot. for Summ. J. at 3 (Statement of Deputy Rack-ard, Nov. 3, 2006).)

. Chief Judge Edmondson cites Forrester in support of the proposition that pain may be inflicted on a passively resisting arrestee to coerce compliance. Forrester, however, simply upheld a jury's conclusion that officers did not use excessive force when they used painful wrist grips, wrist-and arm-twisting, and pressure point holds to move unwilling protesters arrested at a medical building. 25 F.3d at 807-08.
In upholding the jury verdict in favor of the City of San Diego, the Ninth Circuit emphasized that the nature of the force was "less significant than most claims of force” and the state interest in maintaining order was high in light of the presence of more than 100 protesters "operating in an organized and concerted effort to invade private property, obstruct business, and hinder law enforcement.” Id. at 807. The court also noted that "the officers used minimal and controlled force in a manner designed to limit injuries to all involved.” Id. at 808. The restraint device used by the officers in Forrester was described by the court as producing discomfort that was "gradual in nature,” and the court contrasted it with use of force "which would create immediate and searing pain.” Id. at 808 n. 5. The use of the taser by Deputy Raekard produced pain that was neither limited nor gradual.

. The Washington County Sheriff's Office Policy and Procedures Manual provides only that the taser
may be used to control a dangerous or violent subject when deadly physical force does not appear to be justified and/or necessary; or attempts to subdue the subject by other conventional tactics have been, or likely will be, ineffective in the situation at hand; or there is reasonable expectation that it will be unsafe for officers to approach within contact range of the subject.
(Ex. E to Pl.'s Resp. to Defs.' Mot. for Suinm. J., Washington County Sheriff's Office Policy and Procedures Manual, No. 330, at 1.)

. Mr. Buckley states that Deputy Rackard’s repeated jabs with the taser gun "ma[dej it harder for me to follow his commands. Without the use of the Taser by Deputy Raekard, I could have recovered my composure and followed the officer's commands sooner than I did." (Buckley Aff. ¶ 5, Feb. 7, 2007, Ex. A to Pl.'s Resp. to Defs.’ Mot. for Summ. J.)

. (Buckley Aff. ¶¶ 5, 8, Feb. 7, 2007, Ex. A to Pl.’s Resp. to Defs.’ Mot. for Summ. J.)

. Although Chief Judge Edmondson also relies on Deputy Rackard’s pre-tase warnings in support of his conclusions, a warning cannot immunize otherwise excessive force from constitutional scrutiny. See Headwaters Forest, 276 F.3d at 1128-30 (holding repeated use of pepper spray against passively resisting protesters unconstitutional despite fact that officers warned plaintiffs before each discharge).

. The Washington County Sheriff’s Office Policy and Procedures Manual provides:
1. Officers deployed with an AIR TASER shall:
a. Upon encountering a situation, which may require the use of an AIR TASER, request the response of a back-up and a supervisor with an AIR TASER unit (CODE ZEBRA)
b. When practical, don’t escalate the situation prior to the arrival of a back up officer and equipped supervisor.
(Ex. E to PL’s Resp. to Defs.' Mot. for Summ. J., Washington County Sheriff's Office Policy and Procedures Manual, No. 330, at 3, Section 2.E.I. ("Field Officer Responsibilities”).)