240 F.3d 1185 (9th Cir. 2000)
 HEADWATERS FOREST DEFENSE, Plaintiff, and MOLLY BURTON; VERNELL "SPRING" M. LUNDBERG; MICHAEL MCCURDY; ERIC SAMUEL NEUWIRTH; MAYA PORTUGAL; LISA MARIE SANDERSON FOX; JENNIFER SCHNEIDER; TERRI SLANETZ; NOEL TENDICK, Plaintiffs-Appellants,
v.
THE COUNTY OF HUMBOLDT, a political subdivision of the State of California; HUMBOLDT COUNTY SHERIFF'S DEPARTMENT; DENNIS LEWIS, Sheriff; GARY PHILP, Chief Deputy; MARVIN KIRKPATRICK, Deputy; JOHN SYLVIA, Deputy; CIARBELLINI, Sgt.; CITY OF EUREKA, a political division of the State of California; EUREKA POLICE DEPT; BILL HONSAL, Captain; JAMES MANOS, Sgt., Defendants-Appellees.
 No. 98-17250
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted December 6, 1999
Filed May 4, 2000
Amended January 31, 2001
 
 NOTE: ALSO SEE OPINION AT 276 F.3d 1125.[Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 COUNSEL: Mark Hughes, Denver, Colorado, for the plaintiffs-appellants.
 Nancy K. Delaney, Eureka, California, for the defendants appellees.
 Margaret C. Crosby, for amicus curiae American Civil Liberties Union Foundation of Northern California.
 Appeal from the United States District Court for the Northern District of California Vaughn R. Walker, District Judge, Presiding. D.C. No.CV-97-03989-VRW.
 Before: Myron H. Bright,[1] Harry Pregerson, and William A. Fletcher, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 ORDER
 
 1
 With the filing of the Amended Opinion, the panel, as constituted above, has unanimously voted to deny the petition for rehearing. Judges Pregerson and W. Fletcher voted to deny the suggestion for rehearing en banc and Judge Bright so recommended said rejection.
 
 
 2
 The suggestion for en banc rehearing has been circulated to the full court, and no judge of the court has requested a vote on the suggestion for rehearing en banc.
 
 
 3
 The petition for rehearing is denied and the suggestion for rehearing en banc is rejected.
 
 OPINION
 
 4
 Nine environmental activists, along with an entity called Headwaters Forest Defense, brought this action under 42 U.S.C. S 1983, alleging that the use of pepper spray on the activists during three protests in Humboldt County constituted excessive and unreasonable force in violation of their Fourth Amendment rights. The named defendants included Humboldt County and its Sheriff's Department; Humboldt County Sheriff Dennis Lewis and Chief Deputy Sheriff Gary Philp, who authorized the use of pepper spray; the City of Eureka and its Police Department; as well as each law enforcement officer who participated in the protesters' arrests. The district court granted summary judgment on qualified immunity grounds in favor of all individual defendants, except for Sheriff Lewis and Chief Deputy Sheriff Philp.[2] A jury trial in this case consumed nine days. At the close of plaintiffs' case-in chief, the district court ruled that Lewis and Philp were also entitled to qualified immunity as a matter of law and dismissed the case against them. After deliberating for six hours on the remaining claims, the jury announced that it was irreconcilably deadlocked. The district court declared a mistrial and set a new trial date. But eight weeks later, the district court reversed itself and granted defendants' motion for judgment as a matter of law.
 
 
 5
 Plaintiffs contend on appeal that the district court erred in ruling that Sheriff Lewis and Chief Deputy Sheriff Philp were entitled to qualified immunity as a matter of law because historical facts were in dispute and that the court erred in directing a verdict in favor of the remaining defendants. We agree.
 
 I.
 FACTUAL BACKGROUND
 
 6
 In the fall of 1997, environmental activists staged three nonviolent protests against what they perceived to be the unnecessary logging of ancient redwood trees in the Headwaters Forest along California's northern coast. During each protest, two to seven protesters linked themselves together using self-releasing lock-down devices known as "black bears." A "black bear" is a ten to twenty-five pound steel cylinder (about one-fourth of an inch thick) with a rod or post welded into the center. The protesters placed their arms into the steel cylinders and attached steel bracelets worn around their wrists to the center rods or posts in the "black bears " by using mountain climbers' carabiners. Each "black bear" linked two protesters together. When in place, the devices completely immobilized their arms and prevented their separation. By simply using their hands to unclip the carabiners on the inside of the cylinder, the protesters could disengage themselves from the devices. If the protesters did not voluntarily agree to release themselves, the lock-down devices made it difficult, but not impossible, for law enforcement officers to take the protesters into custody upon arrest. To forcibly remove "black bears," the officers had to use a Makita grinder. A Makita grinder is a hand-held electric grinder that can cut through steel.
 
 
 7
 The protesters' use of these lock-down devices is at the heart of this case. Since 1990, nonviolent environmental activists had on many previous occasions used these and other mechanical devices to link themselves physically together during similar protests in Humboldt County. Over the years, the devices became increasingly sturdy and more difficult for the police to remove forcibly. The initial devices were bicycle locks or lightweight metal cylinders, weighing less than five pounds. By 1995, they had evolved into the "black bears" that were used here.
 
 
 8
 In 1997, the Humboldt County Sheriff's Department organized a special response team comprised of Special Services Deputies to deal with the environmental protests. The officers selected for the team were those with special training and experience in the use of a Makita grinder to remove lock down devices safely. By the fall of 1997, one of the officers had used a Makita grinder to remove hundreds of lock-down devices from the arms of environmental protesters. He had done so safely, without causing injuries to either himself or the protesters.
 
 
 9
 Nevertheless, because a Makita grinder generates sparks when used, the defendants claim to have had a growing concern about the danger involved in using it. So, in the summer of 1997, the Humboldt County Sheriff's Department explored alternatives for effecting the arrest of environmental protesters in lock-down devices -including the use of oleoresin capsicum aerosol ("OC" or "pepper spray"). Defendants Lewis and Philp consulted a certified trainer in the use of pepper spray, the county's risk manager, and its district attorney. And they read much of the available literature on the subject. By summer's end, defendants concluded that the use of a lock-down device by any protester -even an otherwise nonviolent protester who posed no danger to the public, himself, or the arresting officers -constituted "active resistance" to arrest, warranting police use of pepper spray as a "pain compliance technique."
 
 
 10
 But, according to then-California Attorney General Dan Lungren, the use of pepper spray under these circumstances was unprecedented; its use had been previously "limited to controlling hostile or violent subjects." Even Sheriff Lewis conceded at trial that no law enforcement officer in Humboldt County, the State of California, or anywhere in the nation had ever used pepper spray on nonviolent protesters as it was used in this case. The defendants nonetheless contend, and the district court found as a matter of law, that the officers' use of pepper spray during the three protests at issue here was reasonable and appropriate under the circumstances.
 
 A. The Scotia Protest
 
 11
 The first protest took place on September 27, 1997, at the headquarters of the Pacific Lumber Company in Scotia, California ("the Scotia protest"). During the Scotia protest, plaintiffs Vernell "Spring" Lundberg (a minor at the time), Jennifer Schneider, Molly Burton, and Eric "Sam" Neuwirth, along with three others, ran into the Pacific Lumber Company lobby, sat down in a circle, and locked themselves together using the "black bears." Meanwhile, other activists held a peaceful rally (including folk music and protest songs) and a mock trial of the owner of Pacific Lumber Company on the sidewalk in front of the Pacific Lumber Company building. Still other activists hung protest signs from the roof of the Pacific Lumber building.
 
 
 12
 Pacific Coast Lumber employees called the Humboldt County Sheriff's Department, which dispatched its special response team. Upon arrival, the officers observed that the seven protesters had placed the "black bears" under their arms and legs, making it particularly difficult to use a grinder to remove them. The officer in charge decided that using pepper spray was the most appropriate and safest way to arrest the trespassing protesters. He and the other officers testified that they made this decision solely because of the difficulty in using a grinder in these circumstances. It was "immaterial" to them that the protesters were peacefully engaged in an act of civil disobedience, as opposed to being violent. And the protesters outside the building were not a factor in their decision to use the pepper spray on those inside the building. Indeed, it is undisputed that the protesters both on the roof and outside the building were nonviolent, did not interfere with ingress or egress to and from the Pacific Lumber building, posed no safety risks to the public or to the officers, and willingly dispersed when their rally and mock trial were ended or when the police directed them to do so.
 
 
 13
 The Sheriff's videotape of the incident reveals that the officers never attempted to negotiate with the protesters. Once they made the decision to use the pepper spray, the officers simply warned the protesters repeatedly that if they refused to release themselves from the "black bears" the officers would apply pepper spray to their faces. The protesters tucked their heads into their chests and refused to release. The officers then forced four protesters' heads back and applied pepper spray with a Q-tip to the corners of their closed eyes. The protesters screamed in pain. The three other protesters, including one who announced that she had asthma, then voluntarily released. The officers put plastic handcuffs on these three protesters and placed them on the couch right next to those still protesting. They remained there for more than an hour, cheering on the others who continued protesting and excoriating the officers for using pepper spray on them. At this point, the officers did not offer to flush out the protesters' eyes with water.
 
 
 14
 The four protesters who remained in the lock-down devices were seated in sets of two. The circle of human legs and arms had been broken. Nevertheless, the officers reapplied the pepper spray with Q-tips to the protesters' eyelids. The protesters still did not release. Twenty minutes after the pepper spray was first applied and six minutes after its second application, the officers sprayed water into the eyes of the protesters to dilute the OC, continuing to do so periodically for more than an hour. Thereafter, the officers escorted the three protesters who were never pepper sprayed out of the building and carried the two pairs of remaining protesters out of the building on stretchers. It took two officers just three minutes to carry each of the two pairs of protesters out of the building; a few other officers present opened doors and directed their movement. The officers appeared to have no trouble lifting and carrying the protesters out. Once outside the building, one pair of protesters voluntarily released themselves. A Makita grinder was used to extricate the other pair from the "black bears." It took ten minutes to remove the device by grinder. The officers threw a fire blanket over the protesters to protect them from the sparks generated by the grinder's use.
 
 B. The Bear Creek Protest
 
 15
 The second protest took place on October 3, 1997, when two pairs of protesters, including plaintiffs Michael McCurdy and Noel Tendick, using "black bears" locked themselves to two Pacific Lumber Company bulldozers at a remote logging site on Pacific Lumber Company property (the "Bear Creek protest"). Again the special response team was called to the scene. The same officer in charge at the Scotia protest was in charge at Bear Creek. He testified that he told the protesters that the officers were going to use pepper spray on them if they didn't release because "we're getting out of here quicker that way." He also testified to his concern that using a grinder would have presented a fire hazard because of the diesel fuel and oil canisters around the bulldozers. He added that protesters hiding in the woods presented an unspecified danger, although the Sheriff's videotape does not show the threatening presence of any other demonstrators. The officers made no attempt to negotiate with the protesters. They simply threatened repeatedly to use pepper spray unless the protesters released themselves from the "black bears." But before proceeding, the officers waited more than half an hour for the video grapher to arrive.
 
 
 16
 The Sheriff's videotape reveals that two protesters released themselves from the "black bears" when threatened with the immediate use of pepper spray. Despite repeated warnings, two others refused. The last warning told the protesters that they had "five minutes" to release themselves from the "black bears." But the actual elapsed time between that last warning and the first application of pepper spray was less than two minutes. The officers applied the pepper spray with a Q-tip to the closed eyes of both protesters. Despite the protesters' pleas for water toflush the pepper spray out of their eyes, one of the officers can be heard on the videotape saying that they will only be given water if they release and that the pain will only get worse in thirty seconds when he sprays the OC in their faces. A minute later, he sprayed the OC directly into both of the protesters' faces in short full bursts from inches away. The videotape reveals that the blast of pepper spray ran down one protester's face and into his mouth.
 
 
 17
 Five minutes later, the protesters again refused to release and the officer in charge said that they "have all day to do this . . . [and] all kinds of cans of chemical weapons." Protester Tendick then said, "If you've got all day to do this, why don't you cut us out?" To which the officer in charge responded, "because we are already committed here." The officers then offered to spray water from hand-held spray bottles onto the protesters' faces to try to flush the pepper spray out. Tendick testified that lightly spraying his face with water only made the pain worse because the water caused the OC to drip into his nose and mouth. On the videotape, Tendick can be heard screaming in pain after the water was administered. Thereafter, a Makita grinder was safely used to cut both protesters out. Despite the officers' stated concern for the danger posed by using the grinder around fuel and oil canisters, the officers did not remove the canisters when they decided to use the grinder. No injuries resulted from the use of the grinder.
 
 C. The Riggs Protest
 
 18
 The third protest took place less than two weeks later, on October 16, 1997, in the Eureka office of Congressman Frank Riggs. Plaintiffs Terri Slanetz, Lisa Sanderson-Fox, MayaPortugal (a minor at the time), and Jennifer Schneider entered the Congressman's office, dropped wood chips on the floor, and chained themselves together using "black bears" around a tree stump that another protester had brought into the Congressman's office. Meanwhile, a crowd of fifty nonviolent protesters gathered on the street outside the Congressman's office.
 
 
 19
 Officers from the Eureka Police Department and from the Humboldt County special response team arrived at the scene in response to calls for assistance made by the Congressman's staff. The Humboldt County special response team determined that the wood chips would create a fire hazard if a grinder was used. Although Congressman Riggs's staff made a vacuum cleaner available to them to remove the wood chips, the officers chose not to use it. Instead, on the basis of the Humboldt officers' recommendation, the Eureka Police Captain in charge authorized the use of pepper spray on the protesters. Again no attempt at negotiation was made.
 
 
 20
 The Sheriff's videotape shows that the officers repeatedly warned the protesters that pepper spray would be used if they did not voluntarily release. One of the protesters declared that they had to take a stand against the use of pepper spray against nonviolent civil protesters. Another pleaded with the officers not to use the pepper spray. She pointed out that the protesters were all young women -one a minor -and asked the officers if they would want someone to use pepper spray on their own daughters. She also pointed out that the protesters posed no danger to anyone. Nevertheless, the officers pulled each of the protester's heads back and applied pepper spray to their eyes with a Q-tip. One protester, Maya Portugal, claims that one of the officers pried open her eyes and applied the pepper spray directly on them. Although the videotape lends some support to this claim, it is ultimately unclear whether this occurred. One of the protesters can be heard on the videotape yelling, "no, don't open them [my eyes]." The defendants deny that any of the protesters' eyes were opened when the pepper spray was used.
 
 
 21
 At this point, no water was offered to wash the pepper spray off the protesters' eyes. Seven minutes after the initial application, one of the officers can be heard on the videotape saying that water will be given if the protesters release themselves from the "black bears." At that point, one of the protesters released, followed shortly thereafter by another, leaving the two remaining protesters attached only to each other. Then, one of the remaining protesters asked why the officers could not physically carry them out of the Congressman's office and use a grinder to cut them out once they were outside the building. An officer responded by saying that the jail "would not accept you like this" and that it "is too dangerous to transport you like this."
 
 
 22
 One officer then stood within a foot of one of the remaining protesters and sprayed the pepper spray directly into her face. Within three minutes, the remaining two protesters released.
 
 
 23
 The officers then offered water from spray bottles to wash the pepper spray off the protesters' faces.
 
 II.
 Procedural History
 
 24
 On October 30, 1997, the nine protesters on whom the police had used pepper spray and an entity called the Headwaters Forest Defense filed this action under 42 U.S.C. S 1983, claiming that the application of pepper spray to the eyelids and faces of nonviolent protesters constituted use of excessive and unreasonable force to effect their arrests in violation of their Fourth Amendment rights. Each plaintiff sought damages for the pain and emotional trauma that each suffered and for the violation of their constitutional rights. Because no one sought medical treatment for physical injuries, special damages were not claimed. But plaintiffs sought punitive damages from the individual defendants.
 
 
 25
 On defendants' motion for summary judgment, the district court granted all individual defendants qualified immunity except for Humboldt County Sheriff Dennis Lewis and Chief Deputy Sheriff Gary Philp, the officers who initially authorized the use of pepper spray on the nonviolent protesters. The court, however, refused to grant summary judgment in favor of the defendants on the excessive force charges. On those charges, the court stated in its written decision that whether the use of pepper spray "is reasonable is for the jury to determine. Jury consideration is particularly appropriate here in that OC, a chemical agent, has not been used in past demonstrations." The court's decision noted that the parties vigorously disputed what occurred before, during, and after the use of pepper spray on the protesters during each protest. All of the disputed facts directly addressed the question whether the use of pepper spray was needed to effect the arrest of nonviolent protesters in lock-down devices. For example, the court's decision noted that the manufacturer's instructions on the canisters of pepper spray that the officers used "expressly discouraged" spraying OC from distances of less than three feet. Similarly, the decision noted that the Humboldt County Sheriff's deputy in charge of chemical agent training -the only certified trainer in the use of OC with whom Lewis and Philp had consulted before authorizing its use -recommended applying pepper spray with a Q-tip only. Yet here, the officers applied full blast sprays of OC into some of the protesters' faces from just inches away.
 
 
 26
 In addition, the court noted that Humboldt County had only one official general order that addressed police use of chemical agents such as pepper spray. And it stated in pertinent part that:
 
 
 27
 The department issues non-lethal aerosol chemical agents to each sworn member of the Department. This aerosol is furnished as a defensive weapon for the protection of department members and as a pos sible alternative to the additional use of force. . . . The chemical agent is intended for use in those cases wherein a member of the Department is attempting to subdue an attacker or a violentlyresisting suspect, or under other circumstances which under the law permit the lawful and necessary use of force, which is best accomplished by the use of a chemical agent.
 
 
 28
 (Emphasis added). Similarly, the Eureka Police Department use-of-force policy statement "classified the use of OC-based products as a compliance technique directly below intermediate force on the use-of-force continuum." (Emphasis added). According to that policy statement, even intermediate force may not be used on nonviolent suspects who are passively resisting arrest. The policy stated in pertinent part that:
 
 
 29
 [OC] shall be used instead of baton strikes whenever practical and when the failure to use it would result in the need to apply more force which holds the greater potential for injury. OC shall not be used to harass or punish a prisoner. Chemical agents are nonlethal devices designed to temporarily subdue or overcome [an arrestee] by spraying the agent into the face. . . ."
 
 
 30
 (Emphasis added).
 
 
 31
 The case proceeded to trial. After nine days, plaintiffs completed their case-in-chief. Thereupon, on defendants' motion, the district court ruled that Lewis and Philp were entitled to qualified immunity as a matter of law and dismissed the case against them. After deliberating for only six hours, the jury announced it was deadlocked.
 
 
 32
 The district court declined to give a formal Allen charge[3] to the jury as both parties requested, but the court did query the jury foreperson "to get some sense from the jury of the degree to which they [felt] that they [were] deadlocked." Without polling each juror, the court satisfied itself that the jurors had fully reviewed the evidence, considered each other's views, and were irreconcilably deadlocked. In a colloquy with counsel on the record but out of the jury's presence, the court stated that the issue in this case is "a simple and straightforward one . . . . It's obviously one on which reasonable people can differ." (Emphasis added). Thereafter, the district court declared a mistrial, set a new trial date, and took under submission defendants' renewed motion for judgment as a matter of law.
 
 
 33
 Eight weeks later, the district court granted defendants' renewed motion, vacated the new trial date, and entered judgment for the defendants, finding that "there is no reasonable basis for jurors to find that the officers' use of [pepper spray] was objectively unreasonable in light of the facts and circumstances confronting them." (Emphasis added). Plaintiffs timely appeal. We have jurisdiction to review the final order of the district court under 28 U.S.C. S 1291.
 
 III.
 A. Judgment as a Matter of Law
 
 34
 We review de novo the district court's grant of judgment as a matter of law, see Acosta v. City and County of San Francisco, 83 F.3d 1143, 1145 (9th Cir. 1996), using "the same standard as the district court . . . under Fed. R. Civ. P. 50(a)." Forrett v. Richardson, 112 F.3d 416, 419 (9th Cir. 1997), overruled on other grounds, Chroma Lighting v. GTE Products Corp., 127 F.3d 1136 (9th Cir. 1997). Rule 50(a)(1) provides in pertinent part that: If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim . . . .
 
 Fed. R. Civ. P. 50(a)(1).[4]
 
 35
 "Judgment as a matter of law is proper if the evidence, construed in the light most favorable to the non-moving party, allows only one reasonable conclusion . . . ." Acosta, 83 F.3d at 1145. "If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986). Indeed, " `[i]f conflicting inferences may be drawn from the facts, the case must go to the jury.' " Pierce v. Multnomah County, Oregon, 76 F.3d 1032, 1037 (9th Cir. 1996) (quoting Rutherford v. City of Berkeley, 780 F.2d 1444, 1448 (9th Cir. 1986)).
 
 
 36
 Here, in its written decision granting defendants judgment as a matter of law, the district court acknowledged its obligation to view the evidence in the light most favorable to the plaintiffs as the nonmoving parties and to resolve all inferences and conflicts in the evidence in their favor. But, as the discussion below reveals, the district court failed to do so. Its decision is replete with assertions that the weight of the evidence favors the defendants and with conclusions that the court reached by resolving conflicts in the evidence against the nonmoving parties. In this regard, the district court erred. As the Supreme Court has held in ruling on a motion for judgment as a matter of law, the [district court] judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.
 
 
 37
 Anderson, 477 U.S. at 252.
 
 
 38
 A jury's inability to reach a verdict does not necessarily preclude a judgment as a matter of law. See, e.g., Demaine v. Bank One, 904 F.2d 219, 220 (4th Cir. 1990). But none of the cases cited by the defendants in support of the directed verdict in this case involved charges of excessive force. Each were contract dispute cases in which the central issue was either the existence of a valid contract, see, e.g., id.; Noonan v. Midland Capital Corp., 453 F.2d 459, 462 (2d Cir. 1972), or whether a contract fell within an exception to the antitrust laws, see City and County of Honolulu v. Hawaii Newspaper Agency, Inc., 559 F. Supp. 1021, 1026 (D. Haw. 1983). Although we have reviewed excessive force cases in which directed verdicts in favor of defendants have been ordered after juries rendered verdicts in favor of the plaintiffs, see, e.g., Forrett, 112 F.3d at 419-21 (affirming district court's order); Acosta, 83 F.3d at 1145-47 (reversing district court's order), we know of no excessive force case that presents the unique procedural posture of this case, i.e., a directed verdict for the defendants after the jury deadlocked and a mistrial was declared.
 
 
 39
 Indeed, Forrester v. City of San Diego, 25 F.3d 804 (9th Cir. 1994), on which defendants primarily rely is procedurally wholly distinguishable from this case. In Forrester, the jury reached a verdict on the excessive force charge, the district court denied a motion for judgment notwithstanding the verdict, and the issue on appeal was whether substantial evidence supported the jury's verdict.[5]See id. at 806.Here, our review of the directed verdict is de novo. See Amarel v. Connell, 102 F.3d 1494, 1517 (9th Cir. 1996). The Forrester court was obligated the give substantial deference to the jury's determination and uphold its verdict so long as the verdict was supported by substantial evidence. See Three Boys Music Corp. v. Bolton, 212 F.3d 477, 482 (9th Cir. 2000) (stating that the Ninth Circuit reviews jury verdicts to determine if they are supported by "substantial evidence"). Because the Forrester court was required to defer to the jury, it ignored evidence that could compel the opposite result on de novo review.
 
 
 40
 The court in Forrester had to decide whether the jury's verdict that police use of Or cutt Police Nonchakus ("OPNs")[6] was not excessive force was reasonable. Here, we consider whether a reasonable jury could conclude that police use of pepper spray constitutes excessive force.
 
 B. Excessive Force
 
 41
 The Fourth Amendment prohibition against unreasonable seizures permits law enforcement officers to use only such force to effect an arrest as is "objectively reasonable" under the circumstances. Graham v. Connor, 490 U.S. 386, 397 (1989); see also Chew, 27 F.3d at 1440-41. As we have repeatedly said, whether the force used to effect an arrest is reasonable "is ordinarily a question of fact for the jury." Liston v. County of Riverside, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (citing, e.g., Forrester v. City of San Diego, 25 F.3d 804, 806 (9th Cir. 1994)); see also Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991). Although excessive force cases can be decided as a matter of law, they rarely are because the Fourth Amendment test for reasonableness is inherently fact-specific. See Chew, 27 F.3d at 1443 (citing Reed v. Hoy, 909 F.2d 324, 330 (9th Cir. 1989)). It is a test that escapes "mechanical application" and "requires careful attention to the facts and circumstances of each particular case," Graham, 490 U.S. at 396, and thus naturally favors jury resolution.
 
 
 42
 According to Graham, "[d]etermining whether the force used to effect a particular seizure is `reasonable' under the Fourth Amendment requires a careful balancing of`the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." 490 U.S. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)) (emphasis added). Assessing "the nature and quality" of a given "intrusion" requires the fact finder to evaluate "the type and amount of force inflict-ed." Chew, 27 F.3d at 1440. Weighing the governmental interests involved requires the fact finder to evaluate such factors as "(1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others, . . . (3) whether he [was] actively resisting arrest or attempting to evade arrest by flight," and any other "exigent circumstances [that] existed at the time of the arrest." Chew, 27 F.3d at 1440-41 & n.5. As we have previously explained, "the essence of the Graham objective reasonableness analysis" is that " `[t]he force which was applied must be balanced against the need for that force: it is the need for force which is at the heart of the Graham factors.' " Liston, 120 F.3d at 976 (quoting Alexander v. City and County of San Francisco, 29 F.3d 1355, 1367 (9th Cir. 1994)) (emphasis added). Thus, where there is no need for force, any force used is constitutionally unreasonable. See P.B. v. Koch, 96 F.3d 1298, 1303-04 & n.4 (9th Cir. 1996).
 
 
 43
 We begin our analysis of the reasonableness of the force used in this case by examining the district court's assessment of the "nature" of the use of pepper spray and the "quality of the intrusion" caused on the protesters' bodily integrity under the Fourth Amendment. We will then examine the district
 
 
 44
 court's assessment of the countervailing governmental interests at stake, focusing first on the interests on which the district court relied in granting defendants' motion for judgment as a matter of law. We will then examine the governmental interests addressed in Fourth Amendment jurisprudence that the district court failed to consider. Such interests include the safety threat, if any, posed by the protesters to the public, to the officers, or to themselves; the exigencies, if any, bearing on the decision to use pepper spray during each protest; the severity of the protesters' crimes; and the alternatives available to the police to effect the arrests of the protesters.
 
 1. The Nature and Quality of the Intrusion
 
 45
 Here, the district court concluded that "the severity of the intrusion upon the arrestees' personal integrity was minimal" because it did not involve the threat of "deadly force or even . . . a significant level of physical force. Rather the force used was merely the infliction of transient pain without significant risk of physical injury." We disagree with this characterization of the intrusion.
 
 
 46
 Although the absence of deadly force or physical blows can mean that a intrusion on an arrestee is "less significant than most claims of force," Forrester, 25 F.3d at 807, that fact alone is not dispositive in excessive force cases. Under Fourth Amendment jurisprudence, the law is well settled that a plaintiff may recover " `nominal damages without proof of actual injury' " for unreasonable intrusions on one's bodily integrity. Larez, 946 F.2d at 640 (quoting Carey v. Piphus, 435 U.S.247, 266 (1978) (holding nominal damages are available under 42 U.S.C. S 1983)). Indeed, in Wilks v. Reyes, 5 F.3d 412 (9th Cir. 1993), we expressly rejected the Fifth Circuit's requirement that a plaintiff show "significant injury" to establish an excessive force claim under the Fourth Amendment. Id. at 416 ("The law of this circuit entitles a plaintiff to an award of nominal damages if the defendant violated the plaintiff's constitutional right . . . even if the plaintiff suffered no actual damage." (emphasis added)). Thus here, the district court erred in focusing on the purported absence of evidence of a "significant risk of physical injury" from the use of pepper spray. Under Graham and Forrester , whether the use of force poses a risk of permanent or significant injury is a factor to be considered in evaluating the need for the force used in a particular case -but it is certainly not dispositive.
 
 
 47
 Moreover, the evidence in the record does not establish that the use of pepper spray here constituted a "minimal" intrusion on the protesters' bodily integrity as a matter of law. The evidence suggests that the protesters suffered excruciating pain when the OC was applied to their eyelids with a Qtip -and even more so when sprayed into their faces in full blasts from inches away. In fact, the Humboldt County Sheriff's deputy in charge of chemical agent training testified that pepper spray is designed to cause intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx. He also testified that its known psychological effects are "disorientation, anxiety, and panic." On this record, a rational juror could readily conclude that the intrusion suffered was more than "minimal."[7]
 
 
 48
 Indeed, our opinion in Forrester suggests that the uncontrollable nature of the pain caused by pepper spray distinguishes it from the "pain compliance technique " challenged in that case. Forrester held that sufficient evidence supported the jury's finding that the use of OPNs was reasonable under the circumstances. OPNs are "two sticks of wood connected at one end by a cord," 25 F.3d at 805, which are used to grip a resisting arrestee's wrist in a progressively tighter and more painful manner until the arrestee ceases resisting. See id. at 808 n.5. In Forrester, the police used OPNs on hundreds of "Operation Rescue" demonstrators who were attempting to shut down the operations of an abortion clinic by blocking access to the facility. See id. at 805, 807.[8] In explaining the nature of the force used in Forrester, we stated:
 
 
 49
 Unlike the use of a lighted cigarette, which would create immediate and searing pain, the discomfort produced by the OPNs was gradual in nature. The videotape (which was seen by the jurors) illustrates that the police first applied a loose grip and then pro gressively tightened their hold until the demonstrators stood and ceased resistance. The moment the demonstrators complied, the police released the OPNs.
 
 
 50
 Id. at 808 n.5. Although the use of OPNs in Forrester caused "varying degrees of injury . . . including bruises, a pinched nerve, and one broken wrist," we upheld the jury's verdict in part because: "Each officer had the discretion to use force or not, and if deciding to do so, how much force to apply." Id. at 808.
 
 
 51
 Here, the videotape evidence reveals that the application of the pepper spray with a Q-tip and then by short full blasts created "immediate and searing pain" that could not be moderated by the officers at their discretion or terminated by them the moment the protesters complied with their demands. According to the defendants, the only way to relieve the pain caused by pepper spray is to flush it out thoroughlywith water. Police training tapes recommend using a "free-flowing hose to wash the victim's face" or "the use of a big bucket of water in which the victim can actually stick [his or her] face down into to get relief." But here, the officers offered only to spray water in short bursts onto the protesters' faces from hand-held plastic bottles, which the evidence suggests may have actually exacerbated the pain by causing the OC to run into the protesters' noses and mouths rather than flushing it out. Moreover, whether water was offered at all for this purpose during each protest is disputed. Yet the district court's ruling fails to mention this evidence, let alone view it in a light most favorable to the plaintiffs as the nonmoving parties.[9]
 
 
 52
 Forrester did not hold "that pain compliance techniques are constitutionally permissible as a matter of law. " 25 F.3d at 809 (Kleinfeld, J., dissenting). Nor did it establish a rule of qualified immunity for the use of pain compliance techniques to arrest passively resisting misdemeanants. Forrester simply held that whether the use of OPNs as a pain compliance technique constituted excessive force was a question of fact that was properly submitted to the jury for its decision. Similarly, we hold here that whether the use of pepper spray in this case constituted excessive force is a question of fact that should have been submitted to a jury for its decision.
 
 2. The Governmental Interests at Stake
 
 53
 The district court found that the primary governmental interests at stake during the three protests were in "quickly removing the trespassing plaintiffs" and in "preventing the organized lawlessness" of a "large group of protesters." The court stated:
 
 
 54
 In each incident, plaintiffs were part of a large group of protesters operating in an organized and concerted effort to invade private property, obstruct business and hinder law enforcement. Although these crimes are misdemeanors, "[t]he wholesale commission of common state-law crimes creates dangers that are far from ordinary. Even in the context of political pro test, organized, premeditated lawlessness menaces in a unique way the capacity of a State to maintain order and preserve the rights of citizens." Bray v. Alexandria Woman's Health Clinic, 506 U.S. 263, 287 (1993) (Kennedy, J., concurring).
 
 
 55
 We disagree with the district court's characterization of the evidence. In assessing the governmental interests, the court failed to view the evidence in the record and all inferences that could be drawn therefrom in a light most favorable to the plaintiffs. Moreover, the court incorrectly applied the Graham test and Justice Kennedy's concurrence in Bray. When the evidence is viewed in the light most favorable to the plaintiffs, it is clear that the governmental interests at stake here do not compel the conclusion that the use of pepper spray -either with a Q-tip or by short full blasts -was reasonably necessary as a matter of law in the totality of the circumstances.
 
 
 56
 i. Speedy Arrests
 
 
 57
 The evidence in the record strongly suggests that the officers' decisions to use pepper spray during each protest had nothing to do with the government's purported interest in "quickly removing the trespassing plaintiffs. " During the Scotia protest, the deputies allowed the threeprotesters who had complied with the police as soon as the pepper spray warnings were given to remain on site -and to continue to cheer on their still-resisting cohorts. If the officers used the pepper spray to hasten the removal of the protesters from private property, failing to remove the protesters who had released from the "black bears" belied this intent. Moreover, the repeated applications of pepper spray actually prolonged the incident for over an hour. Once the decision was made to remove the protesters physically, all were out of the building and in custody within six minutes. Ten minutes later, all were safely ground-out of the lock-down devices.
 
 
 58
 During the Bear Creek incident, the officers delayed using the pepper spray for half an hour until the sheriff's video grapher arrived. In addition, one of the officers was heard to say on the videotape that they "have all day to do this." At Congressman Riggs' office, after the initial applications of pepper spray, two of the protesters voluntarily released themselves from the lock-down devices, but they were not immediately removed from the premises. Nor did the officers physically remove the remaining two female protesters still in the lock-down devices, despite their youth and diminutive size. Instead, the officers chose to reapply the pepper spray in short full bursts into their faces. The evidence suggests that full blast sprays of pepper spray actually delayed the protesters' arrests and prolonged the incident.
 
 
 59
 Thus, the evidence simply does not support the district court's conclusion that the use of pepper spray was needed to remove the protesters from the premises quickly.
 
 
 60
 ii. Organized Lawlessness
 
 
 61
 The district court concluded that one of the reasons the officers needed to use the pepper spray to effect the arrests of the protesters was because "the officers had a substantial interest in preventing the organized lawlessness" of a "large group of protesters." Each incident involved two to seven protesters in lock-down devices -including six young women, two of whom were sixteen and seventeen years old. During both the Scotia and Riggs protests, the protesters in the lock-down devices were demonstrating inside the Pacific Lumber Company building and Congressman Riggs's office. They were physically and visually separated from the large peaceful demonstrations that were taking place outside the two buildings. The evidence regarding the Bear Creek protest is at best conflicting as to how many protesters -other than the four in lock-down devices -were present. The officers claim that many protesters were hiding in the woods. But there is no evidence that a large, lawless group was anywhere in sight.
 
 
 62
 Most importantly, the uncontroverted evidence is that the decision to use pepper spray on the protesters during each incident was not made because of the presence of "a large group of protesters." The officer in charge during each incident testified that the decision to use pepper spray was made solely because of the difficulty in using a Makita grinder to remove the "black bears." With respect to the Scotia and Riggs protests, all the officers who testified stated that the presence of the protesters outside the buildings was not a factor in the decision to use the pepper spray on the protesters inside the buildings.
 
 
 63
 In fact, the defendants consistently testified that the pepper spray was needed during each of the protests simply because a handful of protesters had used lock-down devices, which defendants argued constituted "active" resistance to arrest. But this characterization of the protesters' conduct is belied by the Eureka Police Department's own definition of "active resistance," with which Sheriff Lewis agreed. According to that written definition, "active resistance" occurs when the "subject is attempting to interfere with the officer's actions by inflicting pain or physical injury to the officer without the use of a weapon or object." No evidence in the record suggests that the protesters here attempted to inflict pain or serious injury on the arresting officers.
 
 
 64
 Indeed, there is no evidence supporting the notion that the police needed to use pepper spray in this case to "maintain order and preserve the rights of its citizens" against a "large group" of "lawless" and "menacing" protesters. Forrester, 25 F.3d at 807 (quoting Bray, 506 U.S. at 287 (Kennedy, J., concurring)). The force used to effect arrests can be deemed reasonable only on the basis of the facts and circumstances confronting the police when the arrests took place. Such force cannot be justified on the basis of abstract notions of law and order. Bray was not an excessive force case. Justice Kennedy's cautionary words were uttered in the context of describing when deficiencies in the resources of state and local law enforcement may necessitate the involvement of federal authorities "to protect the lives and property of citizens or to enforce the criminal law." Bray, 506 U.S. at 287-88 (quoting 42 U.S.C. S 10502(3)). His words should not be invoked to justify the use of force to effect arrests in factual circumstances that do not justify the use of force.
 
 
 65
 iii. Safety of Others
 
 
 66
 Under our Fourth Amendment jurisprudence, "the most important single element" in the Graham analysis is "whether the suspect pose[d] an immediate threat to the safety of the officers or others." Chew, 27 F.3d at 1441. Here, the protesters were nonviolent and unarmed. Most were young women, two of whom were minors; none were physically menacing. They posed no safety threat to themselves, the officers, or the public at large.
 
 
 67
 Unlike the protesters in Forrester, the protesters here did not block access to and from a medical clinic," `preventing patients, as well as physicians and medical staff, from entering the clinic to render or receive medical or counseling services.' " 25 F.3d at 805 n.1 (quoting Bray, 506 U.S. at 309). Nor did they behave threateningly toward the police. To the contrary, the protesters repeatedly pleaded with the officers not to use the pepper spray because they posed no danger to anyone. Finally, the protesters posed no danger to themselves. Cf. Monday v. Oullette, 118 F.3d 1099 (6th Cir. 1997) (holding that the use of pepper spray to thwart a suicide attempt of a mentally ill man who refused treatment was reasonable). Because the protesters' conduct posed no danger to themselves or others, a reasonable fact finder could conclude that using pepper spray to effect their arrests bore "no reasonable relation to the need" for force. Koch , 96 F.3d at 1304.
 
 
 68
 iv. Split-Second Judgment
 
 
 69
 Throughout the trial and in their papers on appeal, defendants continually alluded to the ongoing battle the Humboldt County Sheriff's Department and the Eureka Police Department were having with environmental activists prior to the protests in question. But the proper focus of the analysis under Graham is on events immediately confronting the officers when they decided to use pepper spray. The fact that the defendants were increasingly frustrated by the protesters -who had developed techniques such as lock-down devices to prolong nonviolent civil protests -is irrelevant under Graham.
 
 
 70
 Under Graham and its progeny, "[t]he `reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene . . . ." Graham, 490 U.S. at 396 (emphasis added). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -in circumstances that are tense, uncertain, and rapidly evolving -about the amount of force that is necessary in a particular situation." Id. at 396-97. "[W]hen we evaluate whether the police conduct was lawful or unlawful, we must do so in light of the dangerousness of the particular situation that confronted the police," Washington v. Lambert , 98 F.3d 1181, 1186 (9th Cir. 1996), "without regard to [the officers'] underlying intent or motivation," Graham, 490 U.S. at 397.
 
 
 71
 Nothing in the record suggests that the decision to use pepper spray during each of the three protests at issue in this case was a "split-second judgment" made "in circumstances that were `rapidly evolving.' " Chew , 27 F.3d at 1443 (quoting Graham, 490 U.S. at 397). To the contrary, the officers testified that the only exigency here was the use of the "black bear" lock-down devices. And they further testified that the decision authorizing pepper spray's use on any protester using such a lock-down device was made before the officers were even called to the scenes of the protests. In light of this evidence, a reasonable fact finder could conclude that the decisions to use pepper spray during each of the protests were not made in the heat of the moment.
 
 
 72
 v.
 
 Severity of the Crime
 
 73
 The evidence in this case suggests that the only crime the protesters had committed when pepper-sprayed was trespass. Cf. Lamb v. City of Decatur, 947 F. Supp. 1261 (C.D. Ill. 1996) (holding that it was a jury question whether the use of pepper spray on two thousand, nonviolent, unarmed labor protesters who were exercising their First Amendment rights and whose only crime was trespass and therefore "negligible" was reasonable). Although the commission of a misdemeanor offense is "not to be taken lightly," it militates against finding the force used to effect an arrest reasonable where the suspect was also nonviolent and "posed no threat to the safety of the officers or others." Hammer v. Gross, 932 F.3d 842, 846 (9th Cir. 1991) (holding that the fact that the crime committed was a misdemeanor was a factor that the jury should consider in determining whether the forced used by the arresting officer against a DUI suspect to obtain a blood sample over the suspect's verbal objection was reasonable); see also Chew, 27 F.3d at 1442 & n.9 (suggesting that a crime's "severity" in the excessive force context turns on whether it involves violence or an armed suspect).
 
 
 74
 Indeed, the severity of the protesters' crime and their nonviolent behavior stands in stark contrast to that of the felons on whom the use of pepper spray has been deemed reasonable by other courts. For example, the protesters were not belligerent felons resisting arrest for drunk driving as in Passino v. State, 669 N.Y.S.2d 793 (1998) (finding the use of pepper spray to induce cooperation reasonable). Nor were they narcotics suspects on the verge of swallowing contraband as in United States v. Halloway, 906 F. Supp. 1437 (D. Kan. 1995) (finding severity of crime and threat of swallowing contraband sufficient to justify use of pepper spray); Singleton v. City of Newburgh, 1 F. Supp. 2d 306 (S.D.N.Y. 1998) (same). As these cases illustrate, the use of pepper spray on a suspect is not reasonable simply because the police have the legitimate objective of making an arrest. It is only reasonable if such force is needed to make an arrest in the circumstances. Here, a rational juror could conclude that the protesters' nonviolent misdemeanor offense of trespass did not render pepper spray necessary to effect their arrests.
 
 
 75
 vi.
 
 Alternatives Available
 
 76
 Because the protesters posed no immediate threat to the safety of anyone during the protests, the officers -and the district court in reviewing the reasonableness of their actions -were required to consider "[w]hat other tactics if any were available" to effect their arrest. Chew, 27 F.3d at 1443. But, in reviewing the availability of "other tactics, " the district court erred. First, the court simply concluded that the "plaintiffs failed to present any evidence that the officers had a viablealternative means for effecting arrest." To the extent that the court regarded this finding to be determinative, it was mistaken. At most, whether alternatives existed is only a factor to be considered in assessing the need for the force used by the police. See Alexander, 29 F.3d at 1367.
 
 
 77
 Second, plaintiffs presented a great deal of evidence as to alternatives that were available during the protests, including: (a) negotiation; (b) using the Makita grinder or other tools to remove the lock-down devices; (c) physically removing the protesters; (d) and "waiting them out." The court, however, dismissed these alternatives out of hand, resolving all conflicts in the evidence and drawing all inferences therefrom against the plaintiffs. Defendants also presented evidence that they were legitimately concerned about the potential for a grinder's operation to cause a fire or accidental injuries to protesters or to police-operators. Before the protests occurred, defendants concluded that pepper spray was the "safer" tactic for securing the protesters' release from the "black bears." They made this decision despite the officers' extensive training in the use of a Makita grinder and the fact that no injuries had yet occurred when the grinder had been used hundreds of times to remove these lock-down devices.
 
 
 78
 Given the conflicting evidence concerning available alternatives to pepper spray, the district court should not have directed a verdict in favor of defendants. Where the evidence suggests that "other tactics" were available to the police to effect an arrest, the reasonableness of the force used was for the jury to decide. Cf. Chew, 27 F.3d at 1443. The standard governing a court's decision whether to grant judgment as a matter of law does not permit otherwise. See Anderson, 477 U.S. at 252.
 
 IV.
 
 79
 In sum, the district court's conclusion that the officers did not use excessive force to effect the arrests of the protesters as a matter of law is untenable given the evidence presented at trial. Whether the officers reasonably needed to apply pepper spray -either with Q-tips to the protesters' eyelids or by short full blasts into their faces -to arrest the protesters was in dispute. It is clear to us that a "fair-minded jury could return a verdict for the plaintiff[s] on the evidence presented." Id. The evidence reveals that the "nature and quality of the intrusion" caused by the pepper spray on the protesters' bodily integrity under the Fourth Amendment was more than "minimal," as the district court had concluded. Indeed, the pepper spray caused the protesters "immediate and searing pain," Forrester, 25 F.3d at 808 n.5, which the officers could not instantly stop inflicting once the protesters agreed to release themselves from the "black bears." Under the Fourth Amendment, using such a "pain compliance technique" to effect the arrests of nonviolent protesters can only be deemed reasonable force if the countervailing governmental interests at stake were particularly strong. Our analysis of those interests here, however, reveals just the opposite. The protesters posed no safety threat to anyone. Their crime was trespass. The "black bear" lock-down devices they used meant that they could not "evade arrest by flight." Graham, 490 U.S. at 396. They were not "menacing" demonstrators seeking to intimidate the police or the public: most were young women; two were minors. Although the "black bear" devices posed an impediment to arrest, they did not render arrest impossible. Alternatives were available. And the use of pepper spray did not hasten the removal of the protesters from the premises, but prolonged the incidents. In these circumstances, the need for the force used during the protests falls far short of supporting a judgment as a matter of law in favor the defendants.
 
 
 80
 The inherently fact-specific determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases. See Chew, 27 F.3d at 1443; Barlow, 943 F.2d at 1135. This is not such a case. Viewing all the evidence in the light most favorable to the plaintiffs as the nonmoving parties, a rational juror could easily conclude that there was sufficient evidence for a verdict in favor of the plaintiffs. Indeed, the fact that the district judge, after initially declaring a mistrial and ordering a new trial, stated that "reasonable people can differ" on the issue of excessive force in this case speaks directly to the wisdom of our decision now to reverse the court's grant of judgment as a matter of law in favor of the defendants.
 
 V.
 A. Qualified Immunity
 
 81
 " `The doctrine of qualified immunity protects government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Katz v. United States, 194 F.3d 962, 967 (9th Cir. 1999) (quoting Somers v. Thurman, 109 F.3d 614, 616-17 (9th Cir. 1997) (internal quotations omitted) (quoting Harlow v. Fitzgerald , 457 U.S. 800, 818 (1982)). "Qualified immunity protects `all but the plainly incompetent or those who knowingly violate the law.' " Sloman v. Tadlock, 21 F.3d 1462, 1466-67 (9th Cir. 1994) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). The determination whether an official is entitled to qualified immunity involves a two-step analysis: "1) Was the law governing the official's conduct clearly established? 2) Under that law, could a reasonable officer have believed the conduct was lawful?" Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir. 1993).
 
 1. Clearly Established Law
 
 82
 "[W]hether the law was clearly established . . . is a pure question of law for the court to decide." Mendoza v. Block, 27 F.3d 1357, 1360 (9th Cir. 1994). For a right to be "clearly established," its "contours . . . must be sufficiently clear that [at the time the allegedly unlawful action is taken] a reasonable official would understand that what he is doing violates that right." Id. at 1361 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (alternation in original). Although plaintiffs need not show that the very action challenged was previously held unlawful, they must show that " `in the light of pre-existing law the unlawfulness must be apparent.' " Id. (quoting Anderson, 483 U.S. at 640).
 
 
 83
 Here, the district court correctly ruled that the law concerning the use of excessive force is clearly established.
 
 
 84
 It is clearly established that the use of excessive force by police officers in an arrest violates the arrestee's Fourth Amendment right to be free from an unreasonable seizure. The reasonableness of force is analyzed in light of such factors as the requirements for the officer's safety, the motivation for the arrest, and the extent of the injury inflicted.
 
 
 85
 This analysis applies to any arrest situation where force is used, whether it involves physical restraint, use of a baton, use of a gun, or use of a dog. . . . An officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury.
 
 
 86
 Id. at 1362 (internal quotation marks and citations omitted). Thus, even though police use of pepper spray on nonviolent protesters engaged in civil disobedience is unprecedented, Sheriff Lewis and Chief Deputy Sheriff Philp were aware of the law governing its use. Indeed, Sheriff Lewis personally issued Humboldt County Sheriff's Department's general order, which explains the law under Graham and its progeny concerning the relevant factors for assessing the limits on police use of force under the Fourth Amendment.
 
 2. Objective Reasonableness
 
 87
 In a civil rights action in which qualified immunity is asserted, the reasonableness of an officer's conduct comes into play both "as an element of the officer's defense" and "as an element of the plaintiff's case." Katz, 194 F.3d at 967.
 
 
 88
 To determine whether an officer is entitled to the defense of qualified immunity when the use of force is in issue, the question asked is whether a hypothetical officer reasonably could have believed that the amount of force used was reasonable. To resolve the merits of an excessive force claim, the question is whether a reasonable officer could have believed that the force used was necessary under the circum stances. Because of this parity, [this court has] repeatedly held that the inquiry as to whether officers are entitled to qualified immunity for the use of excessive force is the same as the inquiry on the merits of the excessive force claim.
 
 
 89
 Id. at 968 (resolving an apparent intra circuit conflict between excessive force cases that equated the inquiry on the merits with the qualified immunity analysis and other cases that suggested the two lines of inquiry are distinct) (internal quotation marks and citations omitted). Whether the trial judge or jury should ultimately decide if an officer is entitled to qualified immunity in a given case "has not been definitely resolved." Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1100 (9th Cir. 1995) (citing Sloman, 21 F.3d at 146769). But where essential historical facts concerning what an official knew or did are in dispute, "it is clear that these are questions of fact for the jury to determine." Id. at 1099; see also Katz, 194 F.3d at 969 (holding that if disputed facts prevent the court from deciding whether excessive force was used as a matter of law, then the court cannot decide whether officials are entitled to qualified immunity for the use of that force as a matter of law either).
 
 
 90
 Here, because historical facts are in dispute concerning "the amount of force used" and "the circumstances that might justify the amount of force used," id., the district court erred in granting qualified immunity to Sheriff Lewis and Chief Deputy Sheriff Philp as a matter of law. The disputed facts concerning the amount of force used here include: (1) whether the pepper spray was uniformly applied to closed or open eyes; (2) whether the applications of OC with a Q-tip were necessary; (3) whether full blasts of OC sprayed onto the protesters' faces were necessary and executed at a safe distance; (4) whether the application of water by spray bottle to the protesters' eyelids and faces exacerbated the pain caused by the pepper spray or actually provided relief from the OC; and (5) the nature and extent of pain and emotional trauma caused by the Q-tip applications and the full blast spray applications.
 
 
 91
 The disputed facts concerning the circumstances justifying the use of force include: (1) the severity of the crime committed; (2) the danger, if any, posed by the protesters to the public and to the police; (3) whether use of a lock-down device constituted "active resistance" to arrest; (4) whether protesters other than those in lock-down devices posed any threat to the police or the public; (5) whether negotiation, "waiting them out," physically carrying the protesters out, and using the Makita grinder constituted viable and reasonable alternatives; and (6) whether any other exigencies were present to justify applying pepper spray with a Q-tip to the protesters' eyelids and again by full spray blasts into their faces.
 
 
 92
 In addition, Sheriff Lewis's and Chief Deputy Sheriff Philp's individual liability is not just based on the determination whether the use of pepper spray constitutedexcessive force under the circumstances. Their individual liability to the plaintiffs is also based on the extent to which they:
 
 
 93
 "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which [they] knew or reasonably should have known, would cause others to inflict the constitutional injury." A supervisor can be liable in his individual capacity "for his own culpable action or inaction in the training, supervision, or control of his subordinates; [or] for his acquiescence in the constitutional deprivation . . . ."
 
 
 94
 Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998) (quoting Larez, 946 F.2d at 645). Thus, if what they knew and did when they authorized the use of pepper spray on nonviolent protesters is in dispute, their entitlement to qualified immunity cannot be decided as a matter of law by the court. See Sinaloa, 70 F.3d at 1099-1100.
 
 
 95
 Here, much of what Lewis and Philp knew and did is in dispute. For example, Philp testified that in authorizing pepper spray to be used on the protesters, he specifically "told [the officers that he] did not want them to give a full face blast, that [he] wanted them to avoid the direct application to the nose and mouth area, keep it up in the area on more a limited basis and that they were not to apply it [in ] close proximity to the open eyeball." Yet, the officer in charge during each of the protests testified that Philp and Lewis authorized full spray blasts of OC, not just Q-tip applications. The officer who applied the pepper spray to the protesters also testified that Philp never instructed him on whether the pepper spray could or should be reapplied, how often, at what intervals, or under what circumstances.
 
 
 96
 In addition, Lewis and Philp testified that they consulted with the district attorney about the legality and advisability of pepper spray's use on nonviolent protesters. But the district attorney expressly limited his opinion to the issue of criminal liability for an unspecified use of pepper spray, advised that he could not opine as to civil liability, and recommended that defendants obtain a separate opinion about civil liability before using the pepper spray.
 
 
 97
 Lewis also testified that prior to the incidents in this case, he and the County risk manager "discussed the lock devices, what we were encountering and [I] shared with her the concept of the Q-tip application of pepper spray." But the risk manager's testimony contradicts this. She testified that she could not recall a conversation with Philp, Lewis, or any other police official before the incidents at issue concerning the use of OC by Q-tips on nonviolent protesters. She did recall a conversation with Lewis, however, that occurred about a week before the Scotia protest, which was very brief and took place in the hallway outside her office. During that conversation, she spoke with Philp about a specific incident and the possibility of using OC on protesters who locked-down by using concrete, instead of using jack hammers to remove the concrete.
 
 
 98
 Moreover, when Lewis and Philp authorized their officers to use the pepper spray on the plaintiffs, although they fully reviewed the law and consulted then-current literature on law enforcement's tactical use of pepper spray, they both admitted knowing that: (1) the California Department of Justice had only approved the use of pepper spray on "hostile or violent" subjects; (2) the California Highway Patrol's use of force policy specifically prohibits the use of pepper spray as it was used here; and (3) pepper spray had never before been used in this manner in Humboldt County, the State of California, or anywhere in the nation. They also conceded that Humboldt County's only written policy statement on the proper use of pepper spray described it as a "defensive weapon, " only to be used in "attempting to subdue an attacker or a violently resisting suspect, or under other circumstances which underthe law permit the lawful and necessary use of force . . . by . . . chemical agent."
 
 
 99
 Defendants contend that the use of pepper spray here falls under the category of "other circumstances which under the law permit the lawful and necessary use of force . .. by . . . chemical agent." The determination whether that is correct is inextricably linked with the factual question whether the use of pepper spray in this case constituted excessive force. Therefore, under Rule 50, the district court should not have granted defendants' motion for judgment as a matter of law on qualified immunity grounds.
 
 
 100
 In sum, because historical facts were in dispute concerning the reasonableness of the use of pepper spray in this case, as well as what Lewis and Philps knew and did when they authorized its use, the district court erred in deciding that these officials were entitled to qualified immunity as a matter of law.
 
 VI.
 
 101
 Accordingly, we REVERSE the district court's decisions to enter judgment as a matter of law for defendants Humboldt County and its Sheriff's Department and the City of Eureka and its police department and to dismiss Sheriff Lewis and Chief Deputy Sheriff Philp on the basis of qualified immunity. We REMAND this action for a new trial in accordance with the views herein expressed.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.
 
 
 [2]
 To succeed in their S 1983 claims against Humboldt County, the City of Eureka, and their respective police departments, plaintiffs have to establish that: (1) the police used excessive and therefore unconstitutional force in arresting the protesters; and (2) a policy or practice of the municipalities' police departments "cause[d]" or was " `the moving force' behind" the unconstitutional arrests. Chew v. Gates, 27 F.3d 1432, 1444 (9th Cir. 1994) (quoting Monell v. Department of Social Servs. of City of New York, 436 U.S. 658, 694 (1978)). The offending "policy " may be established by "a first-time decision to adopt a particular course of action [when that action] is directed by a governmentally authorized decision maker," such as the chief of police. Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991) (citing Pembaur v. City of Cincinnati , 475 U.S. 469, 481
 (1986)). To succeed in their individual claims against Sheriff Lewis and Chief Deputy Sheriff Philp, plaintiffs must establish that these defendants "set in motion" the acts committed by the arresting officers and that these defendants "knew or reasonably should have known " that such acts would cause constitutional injury, or that these defendants failed "in the training, supervision, or control" of these officers in the proper use of pepper spray to effect an arrest. Watkins v. City of Oakland , 145 F.3d 1087, 1093 (9th Cir. 1998) (quoting Larez, 946 F.2d at 646).
 
 
 [3]
 An Allen charge -named after the case of Allen v. United States, 164 U.S. 492 (1896) in which it was first approved -is a supplemental jury instruction that a trial judge may give when a jury announces that it is unable to agree on a verdict. See United States v. Hernandez, 105 F.3d 1330, 1333-34 (9th Cir. 1997). Without being coercive, an Allen charge urges jurors to keep trying to reach a verdict. See id. It is designed to assist them in finding common ground by reminding them of their duties as jurors, encouraging them to give due deference to the arguments of fellow jurors and to reexamine their own views without abandoning their deeply felt beliefs. See id.; see also Ninth Circuit Manual of Model Criminal Jury Instructions, No.7.6 (1997).
 
 
 [4]
 Technically, the district court here granted defendants' renewed motion for judgment as a matter of law pursuant to Rule 50(b). The fact that the motion was granted after a mistrial was declared because of jury deadlock does not alter the standard to be applied on appeal.
 
 
 [5]
 Curiously, defendants here cite Forrester to support the contention that the existence of videotape footage of each of the incidents in question favors a determination of reasonableness as a matter of law. But this court's reference to the fact that videotape evidence existed in Forrester was made in the context of declaring that "the jury had more than a sufficient amount of evidence presented to them from which they could formulate their verdicts . . . ." Id. at 807. Thus, this aspect of Forrester is inapposite to defendants' contention here. Moreover, the videotape evidence in Forrester aided the jury in reaching a verdict because it apparently "removed much argument and interpretation of the facts themselves." Id. The videotape evidence here appears to raise more questions than it answers, which in the context of a motion for judgment as a matter of law must be resolved in favor of the plaintiffs as the nonmoving parties.
 
 
 [6]
 As discussed infra, OPNs are "two sticks of wood connected at one end by a cord," Forrester, 25 F.3d at 805, which are used to grip a resisting arrestee's wrist in a progressively tighter and more painful manner until the arrestee ceases resisting. See id. at 808 n.5.
 
 
 [7]
 We previously held that the use of pepper spray by a defendant during the commission of a felony may constitute use of a dangerous weapon, defined as "capable of inflicting death or serious bodily injury" for sentencing purposes. United States v. Neill, 166 F.3d 943, 949 (9th Cir. 1999) (citing U.S.S.G. S 1B1.1, cmt. n.1(d),(j)). Admittedly, police use of pepper spray as a tactical tool to effect arrest is distinguishable from its use by a felon during the commission of a robbery. Nevertheless, the evidence in this case reveals that the police sprayed OC directly into some of the protesters' faces from only inches away in much the same manner as the defendant in Neill. And yet, Humboldt County's deputy in charge of chemical agent training testified that spraying OC into a person's face from less than 3 feet is not safe.
 
 
 [8]
 According to the defendants, the demonstrators in Forrester were "truly passive" because they went limp when police attempted to take them into custody, whereas the protesters here were not "passive," but "actively resisting" arrest because they used the lock-down devices. The fact that the demonstrators in Forrester posed an actual safety threat to the public by physically blocking access to medical facilities is a factor that the defendants overlooked in assessing the demonstrators "passive" or "active" stance. In fact, the defendants contend that because we upheld the jury's verdict in Forrester that declared the use of OPNs on "passive" demonstrators to be reasonable under the circumstances, we should therefore hold that the use of pepper spray on the "actively resisting" protesters in this case is also reasonable. This contention reflects a basic misunderstanding of the full factual breadth of the Graham balancing test. More importantly, this contention misses the point of the issue on appeal. Weare not asked to decide whether the use of pepper spray in this case constituted excessive force or not. We are only to decide whether the district court erred in directing a verdict for the defendants in light of the evidence in the record.
 
 
 [9]
 An example of the district court's failure to view the evidence in the light most favorable to the plaintiffs as the nonmoving parties and to resolve all conflicts in the evidence in their favor is the court's statement that "the videotape footage plainly demonstrates that the officers were not making any attempt to open plaintiffs' eyes." The court came to this conclusion despite plaintiff Portugal's contrary testimony, the cry of one of the young female protesters heard on the videotape asking the officers not to open her eyes, and the unclear images revealed on the videotape.